**Juan OCHOA, an Individual, et al.,
Appellants,**

v.

**Clay EVANS, an Individual, Appellee.**

No. 6301.

Court of Civil Appeals of Texas,
El Paso.

Aug. 1, 1973.

Collins, Langford & Pine, William C. Collins, Robert S. Pine, El Paso, for appellants.

Pearson, Speer, Oden & Hardie, Ray Pearson, El Paso, for appellee.

## OPINION

WARD, Justice.

This is an action for conversion. Clay Evans sued the brothers Juan and Ignacio Ochoa and a corporation, The Diamond A Cattle Company, for damages resulting from the conversion of certain Mexican rodeo cattle which are alleged to have been owned by Evans. The Diamond A Cattle Company denied any participation in the transaction while the Ochoa brothers defended primarily on the basis that they had purchased the cattle prior to the purchase made by the plaintiff. The trial Court, based on jury findings, awarded Evans a judgment against all defendants, jointly and severally, for the sum of $19,740.00 as a result of the conversion of 168 head of the cattle and an additional sum of $6,110.-00 against the Ochoa brothers only for the conversion of an additional 52 head of the cattle. The judgment of the trial Court is reversed and rendered insofar as it concerns The Diamond A Cattle Company and affirmed in all other respects.

All of the parties are engaged in the cattle business. The plaintiff is a rancher and is in the business of buying cattle from Mexico. He primarily buys rodeo or "corriente" cattle. These are described as steers with horns longer and larger than those on feeder steers and are of distinct colors. The Diamond A Cattle Company operates ranches in New Mexico and Texas and has its home offices in Roswell, New Mexico. It is interested in buying feeder calves and cattle in Mexico and for this purpose employed Joe Mims as a ranch manager and cattle buyer who operated primarily out of Presidio, Texas. Diamond A does not engage in dealing in rodeo cattle except that as occasional rodeo animals might be found in a feeder shipment, they would be sold to rodeo buyers. The Ochoa brothers were in the ranching and cattle buying business in the State of Chihuahua, Mexico, and were used as commission or order buyers for The Diamond A Cattle Company. In that capacity, they would seek cattle in Mexico for possible purchase by the Diamond A and report this to the Diamond A representatives. If Diamond A decided to buy the cattle they would then consummate the sale directly with the seller. In turn, on a consummated sale, the Diamond A would pay the Ochoas a commission of $2.00 a head for locating the cattle, cutting the desirable ones out of the various herds and seeing to it that the cattle were received at Ojinaga, Mexico, prior to crossing the border at Presidio. Large numbers of feeder cattle had been acquired by the Diamond A through the services of the Ochoa brothers over a period of time, it being established that in the year 1969, the one immediately before the present controversy arose, over 20,000 head of cattle were bought by the company through these same commission buyers.

According to all parties, Eduardo Garcia caused the present lawsuit, there being evidence that he sold the same 220 rodeo steers to both the plaintiff, Clay Evans, and to the Ochoa brothers, who purchased the steers for their own account. In this regard, there exists a dispute as to the number of steers sold and which purchaser was first in time and whether the Ochoas bought for their own account or for the Diamond A. Sometime prior to December 12, 1969, Rene Ramos, a commission or order buyer for Clay Evans, located approximately one thousand head of rodeo cattle held by Eduardo Garcia in a pasture at Montachez, Chihuahua, and in turn contacted Mr. Evans. Thereafter, Evans and Ramos met Garcia in Mexico and, on December 12, 1969, a cattle contract was signed between Clay Evans as buyer and Eduardo Garcia as seller for the one thousand head of rodeo steers previously seen and examined by Ramos. This contract provided that 500 head were to be delivered at Presidio that December and 500 head in January, 1970. Some terms of this contract were changed a few days later at Marfa, Texas, the price being set at approximately $110.00 per steer, and, on De-

cember 19, 1969, the sum of $40,000.00 down payment was paid by Evans to Garcia as required by the sales contract. In December, a "factura" or Mexican title document covering the entire 1,000 head of steers was delivered by Garcia to Evans. On December 29, 1969, Eduardo Garcia crossed to Presidio and delivered to Mr. Evans 351 of the steers, but that was the only delivery ever made on the contract.

According to the Ochoa brothers, it was on November 15, 1969, that they purchased 220 of the rodeo steers from Eduardo Garcia off of the pasture at Montachez, Chihuahua, for which payment was then made by personal checks issued by Juan Ochoa. Juan Ochoa stated that he took possession of these cattle in December, 1969, or early in January, 1970, and started moving them to the Ochoa ranch which lies on the railroad between Chihuahua City and Ojinaga. Some of these steers died but 168 of them were contained in a much larger shipment of cattle which were brought across the border by the Ochoa brothers on the night of April 23, 1970, and placed into the Custom Bonded Pens at Presidio. These 220 steers were the basis by which the judgment was entered in favor of Clay Evans against the Ochoas for conversion, and it was as to the 168 head that were crossed in the shipment for which judgment was entered for Clay Evans against The Diamond A Cattle Company for conversion, the theory of the plaintiff as to the 168 head being that Diamond A knowingly assisted the two Ochoas in crossing this herd from Mexico to the United States.

Of the large shipment of cattle handled by the Ochoa brothers and which crossed the border on the night of April 23, 1970, the 168 rodeo steers as one lot were sold and delivered by the Ochoas to Lucero Brothers the same night the crossing was made to Presidio. Juan Ochoa received one check from the Lucero Brothers in full payment for this lot and this he duly deposited to his account in Mexico. Also in this shipment of the night of April 23rd, was a second lot of 1,100 head of feeder

calves for The Diamond A Cattle Company, which accepted their delivery from the bonded pens the next day, and a third lot consisting of Holstein cattle which were sold by Juan Ochoa to Alfred Logan, this lot having also been acquired previously by the Ochoa brothers for their own account.

The jury issues with their findings are to the following effect: No. 1: Do you find from a preponderance of the evidence that Eduardo Garcia sold the same cattle to Clay Evans and Juan Ochoa and Ignacio Ochoa? Answer—yes. No. 2: Do you find from a preponderance of the evidence, that Eduardo Garcia first sold said cattle inquired about in Special Issue No. 1 to Clay Evans? Answer—yes. No. 3: Do you find from a preponderance of the evidence, that the Diamond A Cattle Company, on or about April 23, 1970, knowingly assisted Juan Ochoa and Ignacio Ochoa in the crossing from Mexico to the United States of 168 head of rodeo cattle? Answer—yes. No. 4: How many head, if any, of said 168 head of rodeo cattle inquired about in Special Issue No. 3 do you find from a preponderance of the evidence, were sold by Eduardo Garcia to Clay Evans? Answer—168. Only "no evidence" objections were made to this form of submission or to the issues.

The primary complaint on this appeal made by The Diamond A Cattle Company is the no evidence point made regarding the jury finding No. 3 that the Diamond A knowingly assisted the Ochoas in crossing the 168 rodeo cattle. As to this legal insufficiency point, we have considered only the evidence and the inferences favorable to the finding and have disregarded all evidence and inferences to the contrary. In this regard, the Ochoa brothers enjoyed the reputation of being The Diamond A Cattle Company's representative in Mexico. Also, the Diamond A and the Ochoas had worked out an arrangement where the main part of the Diamond A brand was registered by the Ochoas as the brand owners in Mexico so that cattle gathered by the Ochoas for the account of Diamond

A would already have the major part of the brand on them and American labor charges would be saved. The brand as registered in Texas and New Mexico by Diamond A and owned by it had an added slash to it and this was not present on the brand owned by the Ochoas in Mexico. Clay Evans and his cattle buyer in January, 1970, became disturbed over their purchase of the rodeo steers and started an investigation. Hearing that Juan Ochoa might take the Eduardo Garcia cattle, Evans called Ochoa, who stated at that time that he would not interefere with Mr. Evans' deal. Later, in January, Evans discovered six of the questioned steers on the Ochoa ranch and one of the brothers denied any knowledge of the other cattle. In the last part of January, Mr. Evans discovered some 150 head of the Garcia rodeo cattle on the Ochoa ranch and testimony was introduced which identified them as part of the same cattle that Evans had purchased. At the time of their discovery, the cattle carried both the Garcia brand and a fresher Diamond A brand. When the Ochoas were confronted by Evans with this information, an argument developed with the Ochoas claiming that they had purchased the cattle first and exhibited to Evans what they claimed to be their "factura" or Mexican title. Evans then called Joe Mims, the ranch manager of the Diamond A, and informed him that he had bought the rodeo cattle and would like to have them. Mims replied that that would be up to the Ochoa boys and that the cattle belonged to the Ochoa boys. On the night of the crossing neither Evans nor Mims was present. With the above background established, Evans at the trial relied upon certain purported documentation to establish that Diamond A knowingly assisted the Ochoas in crossing the disputed cattle. Copies of the inward manifests, covering each truckload of all cattle crossed on the night of April 23, 1970, were introduced into evidence and all reflect Ignacio Ochoa as shipper and J. F. Hendricks as consignee. However, Hendricks, who was the custom broker at Presidio, described an "actual entry document" which showed Diamond A Cattle Company as the buyer of all of the cattle. Because of this document, he stated that he as agent for Diamond A Cattle Company represented to the United States Customs that the cattle were owned by Diamond A Cattle Company and that this "aided" their crossing.

■ What the nature of the "documentation" was is not explained though there is testimony to the effect that it was prepared by the Mexican authorities or by the Mexican Cattlemen's Union. Just how a thought or conclusion of an independent Custom House broker arrived at from hearsay documentation that the whole shipment, including the 168 rodeo steers, belonged to The Diamond A Cattle Company together with his "representation to the United States Custom Service that the whole shipment belonged to The Diamond A Cattle Company" is evidence that the corporation knowingly assisted the Ochoas in the crossing, is not explained. The purported statements in the documentation were hearsay and can form no basis for a finding of fact whether objected to or not. Knapik v. Edison Bros., Inc., 313 S.W.2d 335 (Tex.Civ.App.—Waco 1958, writ ref'd). The evidence is undisputed that the 168 rodeo steers were shipped by the Ochoas as their owners and they received them in the bonded pens and then paid the custom duties and fees to Hendricks, the broker, to secure the release of the cattle. The Diamond A Cattle Company did not appear in any part of this transaction. No unity of design was shown. Kroll v. Collins, 340 S.W.2d 838 (Tex.Civ.App.—San Antonio 1960, no writ).

■■ While not material to the Appellants' point under discussion, in view of its very limited scope, the Appellee argues that after the telephone call from Mr. Evans to Joe Mims, concerning the purchase made by the Ochoas, that Mims refused to do anything about it and that he should have called Mr. Hendricks and advised him that if the Ochoas attempted to bring

across any rodeo cattle, that such cattle would not belong to Diamond A and that they should not be crossed under that name. As we read the testimony, he was merely asked for information and was not requested to do anything nor was any demand made upon him. Regardless, the general rule is that negative conduct even such as passive negligence or nonfeasance cannot base an action for conversion. Annotation 116 A.L.R. 870. This no evidence point is sustained and the insufficient evidence point as to this issue is not reached.

■ The Appellants next assert that there is no evidence to support the jury findings to Issues 1, 2 and 4. In considering their arguments, we note again that the only objections made which are preserved by the Appellants concerning the submitted issues were that no evidence was presented justifying their submission. As stated, the only ground of recovery asserted by the plaintiff against the Ochoas was that of conversion with the Ochoas depending on the defense of prior purchase. In this regard, the parties stipulated during the trial that the applicable Civil Code of the State of Chihuahua provides as follows:

"Article 2082. If the same thing should be sold by the same seller to various persons, there shall be observed the following.

"Article 2083. If the thing sold is a movable the sale first in time shall prevail; if it is not possible to prove the priority of the sale, the sale made to the party who is in possession of the thing shall prevail."

■ It can be seen that Issues 1 and 2 substantially track the effect of Article 2083 of the foreign code and in view of the point preserved we are limited to a consideration of the evidence as related to the submitted issues. Some time is spent by Appellants in their brief arguing that an issue should have been submitted inquiring whether the Ochoas purchased the con-

troversial cattle with notice of the plaintiff's prior rights as well as an issue inquiring if the plaintiff was entitled to the possession of the cattle. In the posture of this appeal, such omitted issues must be deemed as found by the trial Court in such a manner as to support its judgment if the omitted issues are referable to those submitted and if there is evidence to support such implied findings. Rule 279, Texas Rules of Civil Procedure. The omitted issues are referable to the issues submitted as the only theory of recovery made by the plaintiff against the Ochoa brothers was that of conversion. Wells v. Burns, 480 S.W.2d 31 (Tex.Civ.App.—El Paso 1972, no writ).

Turning now to the legal sufficiency of the evidence concerning the three issues, we see that Clay Evans bought the specific lot of 1,000 head of rodeo cattle on December 12, 1969, the cattle being then in the possession of the seller Garcia and having been previously physically examined for Evans by his buyer, Rene Ramos. Although the Ochoas claim to have acquired the title to the cattle under a "factura" or Mexican title, dated November 15, 1969, at one time they admitted that they had taken 220 of the cattle from Eduardo Garcia late in December, 1969, or early in January, 1970, because Juan Ochoa had lent Garcia some money and Garcia then owed him the money. As to the "factura" or Mexican title document, dated November 15, 1969, Juan Ochoa admitted that he did not see and examine any specific cattle which were supposed to be in the possession of Garcia on November 15th; the "factura" itself reflects the signature of E. Garcia, Jr. and is obviously not the same handwriting as appears on plaintiff's cattle contract of date, December 12th, as to which both Evans and Ramos testified was signed by Garcia in their presence; the plaintiff further testified that when Ochoa first showed him his "factura" in the latter part of January, 1970, it had neither a date on it nor any of the brands on it which were

on it at the day of trial. Rene Ramos testified that he was positive that he did see the same cattle which Evans had previously bought in the possession of the Ochoa brothers. Juan Ochoa always maintained that he had purchased 220 of the rodeo steers from Eduardo Garcia and that he crossed 168 of them at Presidio on the night of April 23, 1970. We hold there is direct and inferential evidence to be legally sufficient to support the jury answers to the three issues.

Complaint is next made by the Appellants concerning the factual insufficiency of the evidence to support the jury findings to Issues 1, 2 and 4, and here we consider all of the evidence introduced and the reasonable inferences arising. We note conflicting testimony by Mexican attorneys concerning the legal ability of Clay Evans under Mexican law being able to make any contract in Mexico as he admittedly held no work permit at the time; the testimony of Juan Ochoa that he had actually purchased the cattle in November, 1969, and the payment by him of money to Garcia and testimony that it was impossible to recognize the same cattle a month later from just looking at them where no identifying marks could be seen. Without going into greater detail, and after having examined all of the evidence, we hold that the jury findings to the issues under discussion are not so contrary to the great weight and preponderance as to be clearly wrong and manifestly unjust. The points are overruled.

▌ Appellants contend that judgment should be reversed because the amount awarded the plaintiff permits him to have an unjust enrichment and to recover the market value of cattle for which he never paid. The argument is made that under the terms of his Garcia contract, the plaintiff has paid $40,000.00 as a down payment and has received 351 steers which at approximately $110.00 a steer means he has received already $38,610.00 worth of steers

and to allow a judgment against the Ochoas in the total amount of $25,850.00 is unjust. Appellants rely on cases where the mortgagor seeks damages from the mortgagee for wrongful taking of the mortgaged property and there recovery is limited to the mortgagor's equity in the property, that is, to compensate for the loss sustained less the debt covered by the mortgage. 12 Tex.Jur.2d Chattel Mortgages, Sec. 53, p. 75. But even in that situation where there is the mortgagee's special interest, it is up to such a special interest holder to plead and prove the circumstances under which the offset is claimed. Southwestern Investment Company v. Alvarez, 453 S.W.2d 138 (Tex.Sup.1970); Gathright v. Russell, 383 S.W.2d 441 (Tex.Civ.App.—Tyler 1964, writ dism'd). Here, no offset was pled or issues requested. In addition to that, the Appellants were strangers to the title held by the plaintiff and the general rule is applicable that a plaintiff, who establishes his cause of action, is entitled to recover the value of the converted property at the time of the wrongful taking together with interest from that date. 14 Tex.Jur.2d Conversion, Sec. 24, p. 27. Assuming the plaintiff has a limited interest in the property, he can as against these strangers recover the full value of the property. 18 Am.Jur.2d Conversion, Sec. 90, p. 214. The matter is foreclosed here as the parties stipulated that the fair market value of the steers involved in the conversion would be between $115.00 and $120.00 each, within which limits the Court could set the price or damages and further stipulated Diamond A would be liable only on a total of 168 head, and that the upper limit as to the liability of the Ochoas would be 220 head. Nowhere in the stipulation is it pointed out to the Court that an offset or deduction from the market value measure of damages should be made to avoid a windfall to the plaintiff. The point is overruled.

▌ The trial Court admitted into evidence as an exhibit a sheaf of 62 "factur-

as" offered by the defendants but limited their admission that statements thereon should not be considered as proving the truth of the matters contained therein. We are unable to determine harm as the material is all in Spanish and the defendants have failed to have a translation made. 23 Tex.Jur.2d Evidence, Sec. 292, p. 427. Harmful error is not shown. Rule 434, T.R.C.P.

▆▆▆▆ Appellants complain of the action of the trial Court in overruling their motion to dismiss on the ground that the laws regarding the passage of title to cattle in the Republic of Mexico are so dissimilar to those of the State of Texas that the Texas Court lacks jurisdiction and would be unable to adjudicate the matters in issue. Appellants argue that the sheaf of 62 "facturas" which carry various rubber stamped notations and postage stamps reveal a complete variance from title documents employed in this State. What we have stated regarding those untranslated documents controls this argument. The Appellants then argue that because of the opposing Mexican attorney witnesses differing in their opinions as to the validity or not of a contract, entered into by an American citizen operating in Mexico without a valid working permit, and the necessity of seals or not on the various "facturas" places the Court in a position where it is unable to adjudicate the legality of the various contracts. Authorities relied on by the Appellants are not applicable. Such cases as El Paso & Juarez Traction Co. v. Carruth, 255 S.W. 159 (Tex.Comm'n App.1923) and Carter v. Tillery, 257 S.W.2d 465 (Tex.Civ.App.—Amarillo 1953, writ ref'd n. r. e.), were personal injury suits where the proof established that the Mexican Codes covering the right of action, the measure of damages and the terms of recovery were so dissimilar that the Texas Court could not undertake to adjudicate the rights of the parties; that the applicable Mexican laws were incapable of enforcement in Texas. No such proof is before us and it will be presumed under the facts in this case that conversion, while sounding in tort in Texas, is the same in Mexico, and that the measure of damages and the terms of recovery are likewise the same. Garza v. Greyhound Lines, Inc., 418 S.W.2d 595 (Tex.Civ.App.—San Antonio 1967, no writ). Our Courts are amply empowered to decide the incidental matters concerning the legality of the contracts where the evidence offered on the foreign law is conflicting. State v. Valmont Plantations, 346 S.W.2d 853 (Tex.Civ.App.—San Antonio 1961; aff'd. 163 Tex. 381, 355 S.W.2d 502 (1962)).

▆▆▆▆ The parties readily entered into stipulation as to the applicable Civil Code of Chihuahua so far as it concerned the superior title to the animals, and the case was tried and submitted on the theory that to this extent and to the extent testified to by the experts the law of Mexico controlled. The law of the place where the contract was made was determinative. 12 Tex.Jur.2d Conflict of Laws, Sec. 9, p. 308. The place of the contract was the applicable law as to the priorities of claims to the controversial cattle as between Evans and the Ochoas. The Appellants' points that the Business and Commerce Code of Texas should apply in these matters are overruled.

The judgment of the trial Court as to The Diamond A Cattle Company is reversed and rendered and in that regard it is ordered that the plaintiff, Clay Evans, take nothing by his suit. The judgment of the trial Court entered in favor of Clay Evans against Juan Ochoa and Ignacio Ochoa, jointly and severally, in the total sum of $25,850.00, is affirmed.