**PERMIAN PETROLEUM COMPANY,**
Plaintiff–Appellant,

v.

**PETROLEOS MEXICANOS, a/k/a**
Pemex, Defendant–Appellee.

**PERMIAN PETROLEUM COMPANY,**
Plaintiff–Appellant,

**Dallas International Bank,**
Intervenor–Plaintiff–Appellee,

v.

**PETROLEOS MEXICANOS, a/k/a Pe-**
mex, Defendant–Appellant–Appellee.

Nos. 89–5694, 90–5596.

United States Court of Appeals,
Fifth Circuit.

June 27, 1991.

Rehearing Denied Aug. 12, 1991.

**640**

Douglas S. Johnston, Elaine L. Lawson, A. Randall Friday, Crady, Jewett & McCulley, Houston, Tex., for Petroleos Mexicanos.

Sidney Powell, Strasburger & Price, Dallas, Tex., for Permian Petroleum Co.

Kevin C. Nash, Douglas A. Cawley, Johnson & Gibbs, Dallas, Tex., for intervenor-plaintiff-appellee.

Before CLARK, Chief Judge, RONEY * and DUHÉ, Circuit Judges.

CLARK, Chief Judge:

Permian Petroleum Company (Permian) brought this action against Petroleos Mexicanos (Pemex). Permian claims that Pemex refused to pay for several deliveries of liquified petroleum gas (LPG). Pemex contends that its refusal to pay was proper because a 1983 agreement entitles it to apply a credit against obligations owed to Permian. Dallas International Bank (DIB) intervened and claims that Pemex converted collateral in which DIB allegedly retains a security interest. Texas law governs the issues in this diversity case. The district court granted DIB's motion for summary judgment on the conversion claim and eventually awarded damages. We affirm the summary judgment, vacate the award of conversion damages, and remand. After a bench trial, the district court entered a take-nothing judgment for Permian against Pemex. We vacate this judgment and remand. Both Pemex and Permian claimed attorneys' fees. The district court submitted the issue to a magistrate who ruled in favor of Pemex. Because the attorneys' fee award depends on the resolution of the merits, we also vacate this ruling and remand.

I. Background facts and proceedings below.

A. Background facts.

1) The contract claims.

Permian sued Pemex for breach of contract alleging that Pemex failed to pay for LPG delivered between December 1984 and March 1985 (the 1984–1985 deliveries). The parties stipulated that the total value of the unpaid LPG on the dates of delivery was $5,035,933.00 and that this figure was also the contract price.

The alleged breaches occurred when Permian received notice that Pemex would not pay for these deliveries. Pemex claimed the right to withhold payment because an agreement between Pemex and International Drilling and Energy Company, d/b/a Permian Petroleum Company (IDEC) dated August 12, 1983 allegedly allowed Pemex to offset the value of LPG Pemex furnished to IDEC in the fall of 1983 pursuant to the agreement against the full price of the 1984–1985 deliveries. Permian, however, argues that Pemex's attempted offset was wrongful. The history of the relationships between Permian, IDEC, and Pemex is critical to our resolution of this appeal.

Beginning in late 1979 or early 1980, IDEC began dealing with Pemex as a sup-

* Circuit Judge of the Eleventh Circuit, sitting by designation.

plier and transporter of Pemex's LPG. From the outset of the relationship, IDEC was doing business under the name Permian Petroleum Company. Pemex wanted to deliver LPG to northern Mexico but lacked the transportation system to do so. Pemex found it more economical to either buy LPG in the United States for shipment to northern Mexico or to ship its own LPG to Houston for delivery to United States suppliers and transporters like IDEC who would in turn transport the LPG to northern Mexico. In return for their services, Pemex initially gave its supplier/transporters a "differential"—a specified amount of Pemex's LPG in lieu of cash.

In 1982, Pemex made Gas Del Oro (GDO) its distributor. In this capacity, GDO received LPG shipped by Pemex and delivered it to Pemex's United States supplier/transporters. Pemex would advise GDO by telex the amount of LPG to be delivered to each United States supplier/transporter. GDO would then deliver the designated amount of LPG and confirm the delivery by telex to Pemex.

In late 1982 and early 1983, GDO apparently began shorting United States companies on Pemex's deliveries. Several suppliers, including IDEC, complained to Pemex that they had not received all of the LPG that they were due. Pemex's superintendent for all Pemex international LPG trade, Sergio Jauregui, investigated the complaints and determined that GDO had shorted some suppliers. Jauregui urged GDO to correct the situation, but his efforts were generally unsuccessful. GDO's president died shortly thereafter, and GDO went into bankruptcy.

IDEC claimed to Pemex that Jauregui's investigation confirmed that GDO had shorted IDEC by 4,588,537 gallons of LPG. Pemex maintained that GDO actually delivered the quantity of LPG owed to IDEC. However, Pemex contended it could not deny the truthfulness of IDEC's claim because Pemex did not have access to GDO's records due to the bankruptcy proceedings.

IDEC and Pemex settled their dispute over the GDO deliveries in an agreement dated August 12, 1983. The agreement obligated Pemex to deliver to IDEC the entire quantity of LPG in dispute. The parties have stipulated that Pemex fulfilled this obligation through deliveries to IDEC in September, October, and November 1983.

In return for the immediate delivery of the disputed LPG, Pemex bargained for a contingent double credit that could be exercised against future obligations if Pemex's subsequent investigations revealed that IDEC had actually received the disputed LPG prior to the agreement date. The agreement provides:

> In the event it is found that on or before the date of this Agreement, IDEC had received from GDO or Pemex all or any part of the undelivered LPG, Pemex shall be entitled to receive as a credit against any obligations Pemex owes, or may in the future owe, to IDEC an amount equal to twice the amount of any excess LPG received by IDEC under this agreement.

Several important events occurred prior to the August 12, 1983 agreement. On March 23, 1983, IDEC's president, Willard Payne, died. At the time of Payne's death, IDEC was indebted to Ray Horton in the amount of $652,000. On May 6, 1983, Horton formed Permian. On May 26, 1983, Permian purchased the assets of IDEC's LPG division in a transaction which partially satisfied the debt owed to Horton. Permian contends that IDEC did not enter into any new transactions with Pemex after June 1, 1983.

Shortly after the August 12, 1983 IDEC/Pemex agreement, a letter from IDEC informed Jauregui that Permian was a separate company from IDEC. Pemex maintains that Permian attempted to confuse the identities of IDEC and Permian in order to take advantage of the business relationship between Pemex and IDEC. Pemex claims to have expressed a desire to continue doing business only with the same company with which it had done business in the past. It is undisputed that IDEC had been doing business under the name Permian Petroleum Company and that Horton, who was president of IDEC at the time of

the asset purchase, continued to do business with Pemex as president of Permian. According to Pemex, Permian led Pemex to believe that Permian was the same company with which Pemex had dealt in the past.

After the August 12, 1983 agreement, Pemex began transacting LPG business with Permian. On March 12, 1985, Permian received notice that Pemex refused to pay for the 1984–1985 deliveries. Pemex claims that it exercised its credit option under the August 12, 1983 agreement after obtaining access to GDO's records and discovering that GDO actually delivered the LPG owed to IDEC prior to August 12, 1983. Pemex argues that its refusal to pay for the 1984–1985 deliveries was proper because a double credit for the value of the 4,588,537 gallons of LPG delivered pursuant to the settlement agreement exceeds Pemex's debt to Permian.

### 2) The conversion claim.

DIB made loans to Permian and took perfected security interests in Permian's inventory and accounts receivable. DIB was allowed to intervene in this litigation to assert that Pemex's refusal to pay for the 1984–1985 deliveries was a conversion of its property because DIB held a perfected security interest in Permian's LPG inventory. The parties agree that, on the date of the district court's judgment, the principal owed on Permian's debt to DIB was $3,673,396.33 and the interest owed was $2,644,775.48.

### B. Proceedings below.

The district court granted DIB's motion for summary judgment on its conversion claim and entered a judgment against Pemex for $5,035,933.47 (full value of the collateral) plus prejudgment interest. Pemex appeals both the entry of summary judgment and the amount of the award.

The remaining claims were tried to the bench. The district court found that IDEC received truck deliveries from GDO prior to the August 12, 1983 agreement and that these deliveries accounted for the allegedly undelivered LPG. The district court also concluded that IDEC and Permian were "alter egos of each other." The pertinent district court finding states:

> The preponderance of the evidence shows that both before and after the summer of 1983, these two companies were used interchangeably by Mr. Horton and Mr. [Arturo] Garcia, [Permian's representative for LPG trade with Pemex] to engage in gas exchange and gas purchase transactions with Pemex. The distinction between these companies was never made clear, and the preponderance of the evidence shows that a contract with one was effectively a contract with the other.

The district court held that, under the August 12, 1983 agreement, Pemex was entitled to offset twice the value of the excess LPG delivered in the fall of 1983 against Permian's contract damages. The district court also held that Pemex's exercise of its credit was a breach of contract. Based on the breach of contract ruling, Permian claims prejudgment interest, incidental damages, and attorneys' fees.

Finally, the district court held that Pemex was also entitled to a credit against Permian for any amounts paid to DIB as conversion damages. The parties do not dispute the district court's ruling that Pemex is entitled to a credit for any of Permian's debt to DIB that Pemex pays as conversion damages.

The district court awarded damages in the following manner. First, the court noted that Pemex would owe DIB "about 6.3 million dollars" in conversion damages. Next, the district court estimated that Pemex's credit under the August 12, 1983 agreement would be "approximately five million" dollars. The court then added Pemex's approximate credit for conversion damages and Pemex's approximate credit under the August 12, 1983 agreement in order to estimate Pemex's total credits against Permian. The district court stated: "When you combine these two offsets it effectively wipes out any damage claim of Permian, including the contract price and the interest because Pemex would be entitled to an offset of about $11,000,000."

Without calculating Permian's damages, the district court simply concluded that its

approximation of Pemex's credits appeared to exceed whatever damages Permian could claim. Based on this conclusion and the ruling that Pemex breached its contracts with Permian, the district court entered a take-nothing judgment for Permian. Permian appeals.

Because the district court held both that Pemex breached its contracts and that Pemex was entitled to a credit under the August 12, 1983 agreement, Permian and Pemex each claimed attorneys' fees under Texas law. The district court referred the matter to a magistrate under 28 U.S.C. § 636(b)(1). On February 6, 1990, the magistrate entered an "order" denying Permian's request for attorneys' fees. Permian attempted to appeal that decision to this court on March 6, 1990. On April 4, 1990, we held that we lacked jurisdiction over the appeal from a magistrate's ruling. On May 5, 1990, Permian appealed the magistrate's ruling to the district court. Because Permian appealed the magistrate's ruling 89 days after it was entered, the district court dismissed the appeal as untimely. Permian also appeals this dismissal.

## II. Issues.

### A. The contract claims.

#### 1) The August 12, 1983 agreement.

The district court held that the August 12, 1983 agreement entitled Pemex to offset double the value of its excess LPG deliveries against Permian's contract damages. Permian attacks this holding in several ways.

First, Permian argues that the agreement only entitled Pemex to a double credit against IDEC. The district court found, however, that Permian and IDEC were "alter egos of each other," that Horton and Garcia used the two corporations interchangeably, and that "a contract with one was effectively a contract with the other."

■ Permian argues that the district court's holding that the agreement allowed Pemex to offset its contract credit against Permian resulted from an erroneous application of the Texas alter ego doctrine. In

*Castleberry v. Branscum,* 721 S.W.2d 270 (Tex.1986), the Texas Supreme Court explained that the alter ego doctrine is only one basis for disregarding the corporate fiction. *See id.* at 272–73. Alter ego applies when "there is such unity between corporation and individual that the separateness of the corporation has ceased...." *Id.* at 272. Whether the alter ego doctrine applies depends on the following factors:

the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.

*Id.*

■ As the factors listed by the Texas Supreme Court suggest, the alter ego doctrine generally applies when a party seeks to hold an individual or entity liable for the obligations of a corporation in which the individual or entity owns stock. *See Zahra Spiritual Trust v. United States,* 910 F.2d 240, 245–46 (5th Cir.1990). The alter ego doctrine may also apply in "reverse piercing" situations in which a party seeks to hold a corporation liable for the obligations of a shareholder. *See id.* at 244–46. In *Zahra,* we emphasized that Texas courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless one of the "alter egos" owns stock in the other. *See id.* at 246.

■ Permian correctly asserts that the alter ego doctrine does not apply to today's case. The record does not show that either Permian or IDEC owned stock in the other at any relevant time. Nor did Pemex present sufficient proof that Permian and IDEC failed to follow separate corporate formalities. Our affirmance of the district court on this issue is based not on alter ego but on the Texas sham to perpetrate a fraud doctrine.

■ In *Castleberry,* the Texas Supreme Court explained that purpose of the

sham to perpetrate a fraud doctrine " 'is to prevent use of the corporate entity as a cloak for fraud or illegality or to work an injustice....' " *Castleberry,* 721 S.W.2d at 273 (quoting *Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571, 575 (Tex.1975)). Sham to perpetrate a fraud is an equitable doctrine, and Texas courts take a "flexible fact-specific approach focusing on equity." *Id.* The Texas Supreme Court has also noted that "[t]he variety of shams is infinite," *id.* at 275, and that the purpose of the doctrine " 'should not be thwarted by adherence to any particular theory of liability.' " *Id.* at 273 (quoting *Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571, 575 (Tex.1975)).

■■■ Under Texas law, sham to perpetrate a fraud does not require proof of actual fraud. A party invoking the doctrine must only demonstrate constructive fraud. *Id.* The Texas Supreme Court has distinguished actual and constructive fraud as follows:

Actual fraud usually involves dishonesty of purpose or intent to deceive, whereas constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests.

*Archer v. Griffith,* 390 S.W.2d 735, 740 (Tex.1964).

In today's case, IDEC sold its LPG assets to Permian before entering into the settlement with Pemex. The settlement gave Pemex a double credit against future obligations even though IDEC had already sold its LPG assets. IDEC did not give any notice to Pemex that Permian might be a separate but identically named company until shortly after the August 12, 1983 agreement. The undisputed evidence shows that IDEC used the name Permian Petroleum Company in its business dealings with Pemex, that Horton was president of IDEC at the time he formed Permian, and that Permian used IDEC's place of business, address, and telex number. After the agreement, Horton wrote Pemex that Permian had been doing business with Pemex "for twelve years." Garcia testified that he believed Permian was the same company for which he had worked in the 1970's. Pemex claims that Garcia made such representations to Pemex. The district court found that Horton and Garcia used Permian and IDEC interchangeably to transact business with Pemex. The district court also concluded that the actions of Permian and IDEC created confusion as to which corporation Pemex had dealt with in the past. This finding and conclusion are not clearly erroneous. *See* FED.R.CIV.P. 52(a).

*Castleberry* established that the sham to perpetrate a fraud doctrine is much broader than the alter ego doctrine. *See generally Castleberry,* 721 S.W.2d at 277 (Gonzalez, J., dissenting). Under the sham to perpetrate a fraud doctrine, the district court's fact determinations are sufficient to support the conclusion that the August 12, 1983 agreement entitles Pemex to a double credit for excess gas deliveries against obligations that Pemex owes to Permian.

Permian argues that the alter ego doctrine is the only legal theory available to Pemex on appeal. Permian points out that we have held that, on appeal, a party cannot "switch from one [Texas law] veil piercing theory to another." *Gibralter Sav. v. LDBrinkman Corp.,* 860 F.2d 1275, 1286 (5th Cir.1988), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 988 (1989).

*Gibralter,* however, is not controlling. There, we refused to allow the plaintiff to retry its corporate disregard case on appeal under a different legal theory because the plaintiff failed to submit the alternative theory to the jury through appropriate jury charges and special interrogatories. *See id.* at 1294–95. Jury charges and interrogatories have no place here. In today's bench-tried case, Pemex adequately submitted the sham to perpetrate a fraud theory in its answer to Permian's first amended complaint and in the agreed pretrial order. Moreover, we view the district court's statement that Permian and IDEC were "alter egos of each other" as a fact finding that the two corporations were effectively second selves. The sham to perpetrate a

fraud theory was before the district court. The district court's fact findings addressed it. It is properly before us on appeal.

■ Next, Permian argues that the district court erred by holding that the August 12, 1983 agreement entitled Pemex to a double credit against cash obligations Pemex owed to Permian. The agreement provides that in the event Pemex delivered excess LPG, "Pemex shall be entitled to receive as a credit against any obligations Pemex owes, or may in the future owe, to IDEC an amount equal to twice the amount of any excess LPG received by IDEC under this Agreement." Permian contends that the first "amount" means quantity of LPG. So interpreted, the credit would be a quantity of LPG "equal to twice the amount of any excess...."

Permian's argument is unpersuasive. The agreement clearly allows Pemex to offset against a cash obligation. It states that the credit applies against "any obligations Pemex owes, or may in the future owe...." Permian's interpretation of the word "amount" could lead to the anomalous result that Pemex would receive a credit in LPG against a cash obligation. The most reasonable construction of the agreement is that the first "amount" refers to the value of the credit. This construction permits a credit in LPG against an LPG obligation and a cash credit against a cash obligation. Moreover, Permian's interpretation would make the words "an amount equal to" surplusage. If the parties had intended the credit to be only in LPG, these words would have been unnecessary.

Permian maintains that our decision in *Chevron U.S.A., Inc. v. Belco Petroleum Corp.*, 755 F.2d 1151 (5th Cir.), *cert. denied*, 474 U.S. 847, 106 S.Ct. 140, 88 L.Ed.2d 116 (1985), compels a different result. Permian's reliance on *Chevron* is misplaced. That case dealt with a "gas balancing" agreement which specified that deficiencies in gas were to be balanced by taking or delivering gas. We held that the repeated use of the word "gas" in the agreement precluded the possibility of cash balancing. *See id.* at 1154. In today's case, the agreement could have specified that the credit was to be in gas, but it did not. The district court's construction of the August 12, 1983 agreement was correct.

■ Next, Permian argues that the double credit provision is an invalid penalty clause. We disagree. Under Texas law, a liquidated damages clause is an invalid penalty unless: (1) it was impossible or impractical to estimate damages with any degree of certainty at the time of the contract, and (2) the amount specified as liquidated damages was a reasonable forecast of just compensation. *See Rio Grande Valley Sugar Growers, Inc. v. Campesi*, 592 S.W.2d 340, 342 n. 2 (Tex.1979). The argument is inapposite because the double credit provision in the August 12, 1983 agreement is not a liquidated damages clause.

The Restatement (Second) of Contracts' description of the policy reasons for invalidating liquidated damages clauses differentiates those that create penalties from those that provide compensation.

> The parties to a contract may effectively provide in advance the damages that are to be payable in the event of a breach as long as the provision does not disregard the principle of compensation.... The central objective behind the system of contract remedies is compensatory, not punitive. Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy.

Restatement (Second) of Contracts § 356 comment (a) at 157 (1981). Texas law follows the Restatement's reasoning. *See Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484, 486 (1952).

■ Under Texas law, the rule against punitive liquidated damages clauses applies to agreements that fix damages in advance of a breach. *See id.* The policy of just compensation acts to invalidate such agreements when they are punitive in nature. The rule against punitive liquidated damages clauses, however, does not oper-

ate to invalidate the primary obligation of a contract.

■ In today's case, the August 12, 1983 agreement was a contractual settlement of an existing dispute over allegedly undelivered LPG. The promise of a double credit against future obligations was the primary consideration for Pemex's promise to deliver immediately the allegedly undelivered LPG before a full investigation had been completed. The double credit provision was not a prediction in advance of damages for a possible future breach of the agreement. It was the parties' agreed method of just compensation for immediate delivery that might later be proven incorrect. It is valid under Texas law.

### 2) Sufficiency of evidence to support offset.

The August 12, 1983 agreement fixes the amount of Pemex's credit as twice the value of any "excess" LPG delivered under the agreement. The word "excess" plainly refers to the amount of LPG delivered under the agreement which exceeds the amount of LPG that Pemex owed at the time of the agreement. Thus,

The value of Pemex's credit = the value of $2 \times$ [ (the amount of LPG delivered under the agreement) − (the amount of LPG Pemex owed at the time of the agreement) ].

The parties stipulated that, under the agreement, Pemex delivered 4,024,606 gallons of propane, 508,814 gallons of butane, and 55,117 gallons of natural gasoline. The amount of LPG that Pemex owed at the time of the agreement is disputed.

Pemex argues that, as of August 12, 1983, it could not verify or disprove IDEC's claim that GDO had failed to deliver approximately 4.5 million gallons of LPG because GDO's bankruptcy proceedings precluded access to GDO's records. According to Pemex, when it eventually obtained GDO's records, they revealed that GDO actually delivered the allegedly undelivered LPG by truck to IDEC between November 1982 and March 1983.

The parties stipulated that GDO delivered 1,150,589 gallons of butane and 3,429,-319 gallons of propane by truck to IDEC between November 1982 and March 1983. Pemex claims that these truck deliveries were for Pemex's account and represent the allegedly undelivered LPG. Permian maintains, however, that the truck deliveries represent private transactions between GDO and IDEC that were not for Pemex's account. Under Permian's theory, Pemex owed the exact amounts delivered under the agreement, and Pemex's credit should be zero.

The district court noted that the testimony was conflicting, but found Pemex's evidence to be more credible than Permian's. The court rejected Permian's theory that the truck deliveries were private transactions, and found that the truck deliveries were for Pemex's account. Permian appeals these findings. We review the district court's fact findings under the clearly erroneous standard of Rule 52(a).

IDEC's records suggested that GDO had not delivered LPG owed by Pemex to IDEC. At trial, Pemex introduced two "worksheets," marked exhibits CX and CY, prepared by GDO employees in early April 1983. Pemex argued that these two exhibits show GDO's LPG deliveries to IDEC on behalf of Pemex during the time that GDO allegedly shorted IDEC. According to Pemex, these exhibits include the truck deliveries whereas IDEC's records do not. Pemex noted that the data in the worksheets for pipeline deliveries matched IDEC's records. Pemex also argued that IDEC did not pay for the truck deliveries, that IDEC could not produce written sales contracts between IDEC and GDO for the truck deliveries, and that such contracts are customary. Two former GDO employees who prepared the worksheets also testified that the truck deliveries were for Pemex's account. Finally, Pemex argues that the total number of gallons delivered by truck is almost identical to the total number of gallons in dispute.

In addition to contesting the admissibility of the worksheets, which we discuss *infra*, Permian contends that the evidence was insufficient to support the district court's conclusion that the truck deliveries repre-

sent the undelivered LPG. Permian asserts that the worksheets are unreliable because: (1) they were prepared after the deliveries had been made, (2) the time period covered by exhibits CX and CY is not apparent, (3) the entries for instructions by GDO's Laredo office on exhibit CY are undated, (4) the worksheets contain conflicting data, and (5) neither worksheet shows the balance between Pemex's delivery obligations and actual deliveries. At trial, Permian argued that Pemex failed to produce its own records to show that the truck deliveries were for Pemex's account and that Jauregui's audit confirmed that GDO had shorted Pemex. Permian noted that Pemex could not produce truck tickets or telexes to verify that the truck deliveries had actually been made and that they were for Pemex's account. In an effort to show that the truck deliveries were private trades between GDO and IDEC, Permian introduced evidence that GDO and IDEC had traded privately in the past and that GDO charged IDEC $0.0125 per gallon for the truck deliveries. Permian also argued that the stipulated amounts of LPG delivered by truck do not match the LPG allegedly owed to IDEC as of August 12, 1983. Finally, Permian noted that GDO's bankruptcy trustee filed suit against IDEC for failing to pay for the truck deliveries.

Pemex responded that proof of the truck deliveries was impossible without GDO's records which were unavailable because of GDO's bankruptcy proceedings. According to Pemex, none of the Pemex telexes to GDO specified whether delivery was to be by pipeline or truck. Pemex therefore maintained that its records, like IDEC's, and Jauregui's audit did not take the truck deliveries into account. Pemex explained the $0.0125 per gallon charge as a "loading charge" for loading LPG onto trucks for delivery.

The district court agreed with Pemex. The court noted that there was some evidence of a side agreement between GDO and IDEC, but concluded that the preponderance of the evidence showed otherwise. The lack of a written contract between GDO and IDEC was deemed important by the district court. The district court also found that GDO's bankruptcy trustee's suit only showed what the trustee thought and was not conclusive. The district court's finding that the truck deliveries represented the allegedly undelivered LPG is not clearly erroneous.

3) Admissibility of GDO worksheets.

Permian appeals the district court's admission of two worksheets prepared by GDO employees which were admitted as Pemex exhibits CX and CY. Permian argues that they were not properly authenticated under Fed.R.Evid. 901 and that they are hearsay that is not within the business records exception of Fed.R.Evid. 803(6).

Pemex exhibit CY was admitted without objection. At trial, Pemex exhibit CX was attached to a letter, and Permian offered both the letter and the attachment in evidence. The offer and admission were unlimited. Later in the trial, Pemex's counsel referred to the fact that the worksheet was already in evidence, and Permian's counsel acknowledged this.

■ In this circuit, "unobjected-to hearsay may be considered by the trier of fact for such probative value as it may have." *Flores v. Estelle*, 513 F.2d 764, 766 (5th Cir.), *cert. denied*, 423 U.S. 989, 96 S.Ct. 401, 46 L.Ed.2d 308 (1975). The same is true with respect to authenticity. *See Falcon v. General Tel. Co. of the Southwest*, 626 F.2d 369, 382 (5th Cir.1980), *vacated on other grounds*, 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981).

Permian's brief states that Permian's trial counsel objected to exhibit CX "to the extent [Pemex's] witness could not identify the handwriting as his own...." The record shows that after the worksheet had already been admitted, Permian's counsel did object to one of Pemex's witnesses testifying about information in the worksheet that he did not prepare. That objection went solely to the witness's testimony and was not an objection to the admissibility of the worksheet. There was no objection to the admission of Pemex exhibit CX.

When a party fails to object to the admission of evidence, we review for plain error. *See* Fed.R.Evid. 103(a), (b). Plain error is error which, when examined in the context of the entire case, is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Guzman,* 781 F.2d 428, 431–32 (5th Cir.), *cert. denied,* 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986). The admission of the two worksheets was not plain error.

## B. The conversion claim.

DIB claimed that Pemex's attempt to offset its pre-existing credit under the August 12, 1983 agreement against Pemex's contract obligations to Permian for the 1984–1985 deliveries was a conversion because DIB held perfected security interests in Permian's inventory and accounts receivable. The district court granted DIB's motion for partial summary judgment on the conversion claim. The district court concluded that Pemex converted the LPG under two alternative theories: (1) DIB's perfected security interest in Permian's inventory continued after the LPG was delivered to Pemex, or (2) DIB's perfected security interest in Permian's accounts receivable had priority over Pemex's alleged right to offset its credit against its contract obligation to Permian. Pemex appeals. Because we agree with the district court's reasoning under the first theory, we pretermit review under the second theory.

### 1) Buyer in the ordinary course of business.

The district court held that DIB's perfected security interest in the LPG continued after the LPG was delivered. Pemex argues that it was a buyer in the ordinary course of business (BIOCB) and that this status cut off DIB's security interest in the LPG. The Texas version of the Uniform Commercial Code (U.C.C.) states: "Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise...." Tex.Bus. & Com. Code Ann. § 9.306(b) (Tex. UCC) (Vernon 1968 & Supp.1991). Section 9.307(a), however, provides an exception to this general rule. Under that section, "[a] buyer in the ordinary course of business ... [other than certain buyers of farm products] takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." Tex.Bus. & Com.Code Ann. § 9.307(a) (Tex. UCC) (Vernon 1968 & Supp.1991). Thus, if Pemex was a BIOCB, DIB's security interest in the LPG collateral was cut off by the operation of section 9.307(a). Pemex was not a BIOCB.

The Texas version of the U.C.C. states that BIOCB means "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods *buys* in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker." Tex.Bus. & Com.Code Ann. § 1.201(9) (Tex. UCC) (Vernon 1968 & Supp.1991) (emphasis added). In addition to the requirements of good faith and lack of knowledge, section 1.201(9) requires that a BIOCB must "buy." Section 1.102(9) states: " 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but *does not include a transfer* in bulk or as security for or *in total or partial satisfaction of a money debt." Id.* (emphasis added). Under section 1.102(9), one who transfers goods in total or partial satisfaction of a money debt is not a BIOCB regardless of good faith or lack of knowledge. *See Chrysler Credit Corp. v. Malone,* 502 S.W.2d 910, 913 (Tex.Civ.App.—Fort Worth 1973, no writ).

In conjunction with section 9.307(a), the definition of a BIOCB in section 1.102(9) establishes the concept of new value which is "central to the functioning of the Code's system of inventory financing." *United States v. Handy & Harman,* 750 F.2d 777,

781 (9th Cir.1984). Under section 9.306(b), the inventory financer's security interest in the collateral survives the seller's disposition and also continues in any identifiable proceeds. Section 9.307(a) provides that a purchase cuts off the security interest in the collateral if the purchaser is a BIOCB. In order to be a BIOCB, section 1.201(9) requires the purchaser to give new value. If the purchaser is a BIOCB, the inventory financer is protected to the extent that the security interest continues in the new value as proceeds. If the purchaser gives no new value, section 9.306(b) does not cut off the security interest in the collateral, and the inventory financer continues to be protected by its security interest in the collateral which survives the purchase. *See generally Handy & Harman,* 750 F.2d at 780–82; *Chrysler Credit Corp.,* 502 S.W.2d at 912–13; J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code,* § 25–13 (2d ed.1980).

In today's case, Pemex exercised a pre-existing contract credit against its money obligation and gave no new value in exchange for the Permian LPG in which DIB held a perfected security interest. Pemex is not a BIOCB for purposes of this transaction because Pemex did not engage in "buying" under section 1.201(9). *See Handy & Harman,* 750 F.2d at 782; J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code,* § 26–13 (3d ed.1988).

Pemex points out that *Handy & Harman* left open the possibility that a purchaser who offsets the purchase price against a debt that was not in existence at the time of the purchase might still qualify as a BIOCB. *See Handy & Harman,* 750 F.2d at 782. Pemex argues that the credit under the August 12, 1983 agreement was not a pre-existing debt because it did not arise until Pemex discovered that the GDO truck deliveries applied against IDEC's claim for undelivered LPG. According to Pemex, this discovery occurred after Pemex received the 1984–1985 deliveries from Permian. However, all of the operative events necessary to the creation of the credit had occurred at the time of the August 12, 1983 agreement out of which the

credit arose. Pemex's entitlement to the credit turned on whether GDO had actually shorted IDEC prior to August 12, 1983. For purposes of section 1.201(9), Pemex's credit was in existence at the time of the purchase regardless of when Pemex became convinced that the credit could be exercised. This reasoning is consistent with the policy of new value which pervades the inventory financing provisions of the Texas U.C.C. Thus, we need not decide the question left open by the Ninth Circuit.

Finally, Pemex argues that BIOCB status should be determined once and for all on the date of the purchase. Pemex takes the position that "buying" occurs if, on the date of the purchase, the purchaser intends in good faith to give new value. We disagree.

Many sections in Article IX contain specific timing provisions. *See, e.g.,* Tex.Bus. & Com.Code Ann. §§ 9.204, 9.303 (Tex. UCC) (Vernon 1968 & Supp.1991). Neither section 9.307, which governs protection of BIOCBs, nor section 1.201(9), which defines a BIOCB and buying, contains a timing provision. Nor does either section say anything about the purchaser's good faith intent to give new value. Under sections 9.307(a) and 1.102(9), the ultimate inquiry is whether the purchaser is entitled to take free of a security interest created by the seller. Nothing in these sections indicates that inventory financers who lend money for sales on open accounts should receive less protection than other inventory financers. The precise date on which BIOCB status accrues is not controlling. Pemex was not a BIOCB and did not take free of the security interest created by Permian.

### 2) Authorization.

Pemex also argues that DIB authorized the LPG transaction in question. As noted *supra,* section 9.306(b) of the Texas version of the U.C.C. provides that a sale, exchange, or other disposition of collateral by the debtor does not cut off a security interest in the collateral unless the disposition was authorized by the secured party. Under this section, if DIB authorized the transaction, DIB's security interest in the

LPG did not continue after the disposition to Pemex.

The district court granted DIB's motion for partial summary judgment and held that the transaction was not authorized. Summary judgment is proper when the summary judgment evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On appeal, the standard of review is the same standard applied by the district court, and we view the facts in the light most favorable to the nonmovant. *See Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir.1989).

In response to DIB's summary judgment motion, Pemex argued that the loan agreement between DIB and Permian authorized the transaction which allegedly constituted a conversion. Pemex's only summary judgment evidence on this issue consisted of excerpts from the loan agreement. Neither Pemex nor DIB argues that the loan agreement is ambiguous. Interpretation of an unambiguous contract is an issue of law which we review de novo. *See Webb Carter Constr. Co. v. Louisiana Central Bank*, 922 F.2d 1197, 1199 (5th Cir.1991). DIB made the entire loan agreement a part of the summary judgment record.

Pemex points to section 4.04(j) which provides:

Except as expressly provided in the Loan Instruments, so long as any part of the indebtedness or obligations referred to in Paragraph 4.02 remains unpaid or unperformed, without the prior written consent of [DIB], [Permian] will not (i) sell, assign, transfer, remove or otherwise dispose of any of the Collateral, or any interest therein, *except Product sold to Pemex,* or (ii) further encumber the Collateral, or any interest therein, or permit the Collateral or any interest therein, to be or become subject to any security interest, assignment, or to any attachment, execution, sequestration, or other legal or equitable process, or to any encumbrance whatsoever, except the security interests and encumbrances contem-

plated by the Loan Instruments. (emphasis added)

Pemex argues that the emphasized language constitutes authorization for the transaction in question. We disagree.

The words "except Product sold to Pemex" merely exempt LPG sales to Pemex from the requirement of prior written authorization by DIB. Nothing in the agreement authorized Permian to allow the collateral to become subject to an offset against a pre-existing credit. The second condition in the section clearly prohibits Permian from permitting the collateral to become subject "to any attachment, execution, sequestration, or other legal or equitable process, or to any encumbrance whatsoever...." Specifically, section 4.04(b) provides: "[Permian] shall keep the Collateral free from any and all liens, security interests, set-offs, recoupment or encumbrance...."

Moreover, in the context of the entire loan agreement, the words "except Product sold to Pemex" do not cover this disposition of the collateral. The loan agreement provides security for Permian's promise to repay DIB's loans. The inventory financing mechanism necessarily contemplates dispositions of inventory. However, as the language quoted from sections 4.04(a) and 4.04(j) indicates, this loan agreement prohibits many types of dispositions that jeopardize DIB's security. The disposition at issue here—a transfer of collateral offset by a pre-existing credit—involves no new value. It clearly jeopardizes DIB's security unless the security interest continues in the collateral.

"[I]t is assumed that parties entering into contracts within the purview of the Code do so in reference to its purposes and policies...." *In re Del Tex Corp.*, 32 B.R. 403 (Bankr.W.D.Tex.1983). As our discussion of section 9.307(a) indicates, an express authorization for dispositions that results in no new value would be inconsistent with DIB's interest in retaining security for its loans. Under the present loan agreement, Pemex cannot take both the position that its alleged BIOCB status cut

off DIB's security interest without an exchange for new value and the position that DIB authorized the disposition that would create this result. In the context of this loan agreement, the word "sold" reasonably implicates "buying," which, under section 1.201(9), does not include a transfer in satisfaction of a pre-existing money debt. "[S]old" reasonably encompasses only exchanges for new value, not this disposition.

Pemex points out that the loan agreement requires each loan request to be accompanied by "Pemex Sale Documentation" and that this documentation implicitly permits transactions on open accounts. Pemex concludes that DIB did not exclude transactions on open accounts from the definition of sale. This argument is not inconsistent with our interpretation of "sold." A transaction on an open account can yield new value when the account debtor pays the debt. This is what happened until Pemex attempted to use its credit. Although the loan agreement authorized certain dispositions to Pemex on an open account, it did not authorize the disposition at issue. Viewed in its entirety, the loan agreement establishes that DIB did not authorize the transaction in question. Pemex failed to establish the existence of a genuine issue of material fact, and summary judgment was properly granted.

### C. Damages.

#### 1) DIB's conversion damages.

Pemex appeals the district court's calculation of DIB's conversion damages. The district court awarded DIB $5,035,933.00 as actual damages and $1,325,574 in prejudgment interest. The actual damages figure was calculated by using the stipulated value of the collateral on the dates of delivery. Pemex argues that the district court should not have based the value of the collateral on the dates of delivery and erred in awarding the full value of the collateral as conversion damages.

■ Texas law defines conversion as "[t]he wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex.1971). A secured party may bring an action in conversion against a third party in order to vindicate rights in collateral. *See Chrysler Credit Corp.*, 502 S.W.2d at 914–15; *White–Sellie's Jewelry Co. v. Goodyear Tire & Rubber Co.*, 477 S.W.2d 658, 662 (Tex.Civ.App.—Houston [14th Dist.] 1972, no writ). Conversion damages are the value of the converted property on the date of conversion plus prejudgment interest. *See Bishop v. Geno Designs, Inc.*, 631 S.W.2d 581, 584 (Tex. App.—Tyler 1982, no writ).

■ Under Texas law, when a party lawfully acquires possession of personalty, conversion generally occurs upon a demand for return of the property and a refusal. *See Loomis v. Sharp*, 519 S.W.2d 955, 958 (Tex.Civ.App.—Texarkana 1975, writ dism'd). However, "formal demand and refusal are not necessary when the circumstances and the acts of the possessor authorize a finding ... of a clear repudiation of the owner's rights and are tantamount to a refusal after demand." *Id.*

In *Chrysler Credit Corp.*, Chrysler held a security interest in a car. Chrysler brought a conversion action against a purchaser who took the car in partial satisfaction of a debt owed to him by the dealer. The purchase violated a condition in the security agreement providing that the debtor would not sell the collateral to anyone other than a BIOCB. The court held that the purchaser's initial acquisition of the car was inconsistent with the security agreement and that conversion occurred on the date of acquisition. *See Chrysler Credit Corp.*, 502 S.W.2d at 914. Demand was held to be unnecessary. *See id. Chrysler Credit Corp.* holds that conversion occurs when a purchaser in possession of collateral who is not a BIOCB takes actions that are inconsistent with a secured creditor's rights under the security agreement. *Chrysler Credit Corp.* and *Loomis* establish that such actions constitute "a clear repudiation of the owner's rights ... tantamount to a refusal after demand" under *Loomis*, and that demand is therefore unnecessary.

■ In today's case, Pemex's initial acquisition of the LPG was not inconsistent with the loan agreement between DIB and Permian. However, Pemex's attempt to offset its credit against the purchase price of the LPG was unauthorized and in violation of DIB's continuing rights in the collateral. Pemex's conversion occurred on March 12, 1985—the stipulated date on which Permian received Pemex's letter announcing that Pemex would exercise its credit against the purchase price.

The district court erred by measuring the value of the collateral on the dates of delivery which were between December 1984 and March 1985. Recalculation of the value of the collateral on March 12, 1985 is necessary.

Pemex also argues that the district court should not have awarded DIB the full value of the collateral as actual damages. Pemex contends that actual conversion damages should have been limited to the outstanding principal balance of DIB's loan to Permian.

■ Under Texas law, a secured party may recover as actual conversion damages the value of the secured interest in the collateral up to the value of the collateral. *See Hodges v. Leach*, 214 S.W.2d 837, 842 (Tex.Civ.App.—Amarillo 1948). DIB's security agreement secures the accrued interest, costs, and attorneys' fees as well as the outstanding principal. In this case, therefore, DIB may recover as actual damages either the outstanding principal balance plus the outstanding interest obligation, costs, and attorneys' fees or it may recover the value of the collateral, whichever is less.

■ Prejudgment interest represents the income-earning potential of the converted property. Normally, under Texas law, prejudgment interest on conversion damages runs from the date of conversion. *See Metal Window Prods. Co. v. Nored*, 535 S.W.2d 711, 713 (Tex.Civ.App.—Beaumont 1976, no writ); *Ochoa v. Evans*, 498 S.W.2d 380, 386 (Tex.Civ.App.—El Paso 1973, no writ). In today's case, however, the aggrieved party's ownership interest in the property is tied to a debt that continued to increase as interest accrued. An award of prejudgment interest for periods during which the value of DIB's secured interest was increasing because Permian's interest obligation was increasing would overcompensate DIB. Therefore, prejudgment interest should run, if at all, only during periods when the value of Permian's secured interest exceeded the value of the collateral on the date of conversion. It is undisputed that on the date of the district court's judgment, the outstanding principal balance was $3,673,396.33, and the outstanding interest obligation was $2,644,775.48.

The following facts are necessary to a determination of conversion damages. The parties should be able to stipulate them. If they cannot and record proof is confusing or lacking, the district court should make the required findings based on additional evidence. If definitive proof is lacking, the court should make the best possible estimation.

The facts needed are:

(1) The value of the collateral on the date of conversion.

(2) The total value of the secured principal, interest, costs and fees Permian owed DIB on the date judgment is entered on remand.

(3) If the value of (2) now exceeds (1) but was less than (1) on the date of conversion, one additional fact must be determined—the date on which the increasing interest charges caused the value relationship to change.

When these facts have been fixed, the calculation of conversion damages should proceed as follows:

(a) If the value of (1) exceeds the value of (2), conversion damages equal (2);

(b) If the value of (1) is less than the value of (2), and if the contingency provided in (3) did not occur, conversion damages equal (1) plus prejudgment interest at the rate provided in the financing agreement between Permian and DIB from the date of conversion to the date judgment is entered on remand;

(c) If the contingency provided in (3) occurred, conversion damages equal (1) plus prejudgment interest from the date (1) became less than (2).

### 2) Contract claims.

The parties agree that Pemex is entitled to a credit against Permian's contract damages for the actual conversion damage amounts Pemex pays to DIB which satisfy Permian's debt to DIB. The August 12, 1983 agreement entitles Pemex to a credit for double the value of the excess LPG delivered pursuant to the agreement. Both of these credits apply against Permian's contract claim.

The district court estimated Pemex's two credits, found the estimated amounts would exceed any amount of damages that Permian could claim, and entered a take-nothing judgment for Permian. The district court's additional findings on DIB's conversion damages may alter Pemex's credit against Permian for damages paid to DIB. For reasons explained *infra,* we also vacate the district court's ruling that Pemex breached contracts with Permian, the estimation of Pemex's conversion damages credit, and the estimation of Pemex's credit under the August 12, 1983 agreement. Because the resolution of these issues may also change the proper damages calculus, we vacate the district court's ruling that Pemex's two credits would exceed Permian's damages.

### a) Permian's contract damages.

Permian claimed the following damages resulted from Pemex's refusal to pay for the 1984–1985 deliveries and exercise of its credit under the August 12, 1983 agreement: (i) contract damages for the purchase price of the LPG which was stipulated to be $5,035,933.47, (ii) contract interest from the time of the refusal to pay until the date of judgment, (iii) incidental damages consisting of accrued interest on the loan from DIB which Permian was allegedly unable to pay without the money owed by Pemex for the purchase price, and (iv) attorneys' fees.

The viability of Permian's contract interest, incidental damages, and attorneys' fees claims depends on whether or not Pemex committed a breach of contract. Without explanation, the district court held that Pemex's refusal to pay for the 1984–1985 deliveries constituted a breach of contract despite the fact that the district court also held that Pemex had a valid credit under the August 12, 1983 agreement.

 Instead of paying for the 1984–1985 deliveries, Pemex claimed an offsetting credit under the August 12, 1983 agreement which we hold was valid against Permian. The issue is whether there was a breach of contract where Pemex exercised that valid credit. The parties have cited no Texas cases precisely on point, and we can find none. Texas follows the common-law rule that mutual debts generally do not extinguish each other. *See Benton v. Wilmer–Hutchins Indep. School Dist.,* 662 S.W.2d 696, 698 (Tex.App.—Dallas 1983, writ dism'd). However, there is an exception to this general rule when the mutual debts extinguish each other by agreement or judicial action. *See id.*

 In today's case, the August 12, 1983 agreement provides that Pemex's credit for excess deliveries could extinguish future obligations. If Pemex's credit under the agreement fully covers the LPG purchase price, a ruling that a breach occurred—with the consequence of possibly exposing Pemex to interest, incidental damages, and attorneys' fees—would work an injustice and deprive Pemex of the benefit of its bargain. On the other hand, Permian would have a valid claim for breach of contract if Pemex's credit is worth less than the purchase price of the LPG. Thus, we hold that a breach occurred only if the district court on remand determines that the purchase price of the LPG exceeds the value of Pemex's credit under the August 12, 1983 agreement. The district court did not attempt to calculate accurately the value of Pemex's credit under the agreement. Whether a breach occurred must follow such proper calculations.

If no breach occurred, Permian's damage claims would be limited to the purchase

price of the LPG. If a breach occurred, Permian's claims for interest, incidental damages, and attorneys' fees may be viable. Permian is only entitled to such damages as were proximately caused by the breach—the amount by which the purchase price exceeds the value of Pemex's credit under the agreement. Similarly, if the district court decides to award Permian attorneys' fees, the district court should base them on the amount of the breach.

■ Pemex contests Permian's entitlement to contract interest. After holding that a breach occurred, the district court stated that "Permian would be entitled to recover interest." It did not further characterize the "interest" it awarded.

Permian supports its claim for contract interest by arguing that its invoices were stamped with a provision stating that interest would accrue at DIB's prime rate, plus one percent, if the purchase price was not paid at maturity. It is undisputed that Pemex sent orders for LPG by telex and that Permian delivered the LPG with invoices which were stamped by Pemex upon receipt. It is also undisputed that Pemex never objected to the invoice interest provision. The district court did not find when offer and acceptance occurred.

■ If Pemex's telexes were invitations for an offer, the contract interest provision was part of the offer which was accepted when Pemex took delivery of the LPG. On the other hand, if Pemex's telexes were offers, Permian's invoices were written confirmations of acceptance which operate as acceptances, *see* Tex.Bus. & Com.Code Ann. § 2.207(a) (Tex. UCC) (Vernon 1968), and the interest provision in the Permian invoices was a proposal for an addition to the contract. *See id.* § 2.207(b). Under Texas law, between merchants such as Pemex and Permian, such additions become part of the contract unless: "(1) the offer expressly limits acceptance to the terms of the offer; (2) they materially alter it; or (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." *Id.* Pemex does not allege that the telexes expressly limited acceptance to the terms of the offer. Under Texas law, a term providing for interest on overdue invoices does not materially alter the contract. *See* Tex.Bus. & Comm.Code Ann. § 2.207, comment 5 (Tex. UCC) (Vernon 1968); *Preston Farm & Ranch Supply, Inc. v. Bio–Zyme Enter.*, 615 S.W.2d 258, 260–61 (Tex.Civ.App.—Dallas 1981), *aff'd*, 625 S.W.2d 295 (Tex.1981). The contract interest provision became part of the contract either as part of the offer or as part of the acceptance under section 2.207. Thus, if there was a breach, Permian is entitled to contract interest on the amount thereof.

■ The district court did not discuss Permian's claim for incidental damages. Pemex argues that awarding both contract interest and incidental damages would overcompensate Permian. We agree. Under Texas law, "actual interest expenses on money borrowed by the seller to finance the subject matter of the contract, incurred after and as a result of a buyer's breach, are incidental damages under section 2.710 [of the Texas U.C.C.]." *Gray v. West*, 608 S.W.2d 771, 781 (Tex.Civ.App.—Amarillo 1980, writ ref'd n.r.e.).

■ The purpose of interest as damages, whether fixed by law or by the parties, is "to compensate an aggrieved party for the detention of money rightfully due him." *Simmons v. Wilson*, 216 S.W.2d 847, 855 (Tex.Civ.App.—Waco 1949, no writ); *see Walter E. Heller & Co. v. Barnes*, 412 S.W.2d 747, 757 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.). Similarly, the purpose of allowing inventory financing costs as incidental damages is to compensate the seller for charges incurred because the purchaser detains money rightfully due to the seller. *See Gray*, 608 S.W.2d at 781. Interest as damages represents the income that the aggrieved party could have earned on the principal if it had been paid when due. The aggrieved party also could have used the principal to pay off financing charges instead of using it to earn income. However, the aggrieved party could not have simultaneously used the entire principal both to earn income and to pay off financing charges. Thus, any

amount a seller may recover as incidental damages for the cost of financing inventory for which a purchaser refuses to pay would duplicate interest recovered as damages. *See Intermeat, Inc. v. American Poultry Inc.*, 575 F.2d 1017, 1024–25 (2nd Cir.1978) (cited with approval in *Gray*).

In today's case, an interest rate was fixed by the contract. The interest rate—DIB prime plus one percent—was specifically tied to the financer's interest rate. Permian is not entitled to incidental damages for accrued financing charges because the contract interest provision addresses this aspect of damages. By setting forth the amount of interest chargeable for late payments, the agreement between the parties modifies the type of incidental damages recoverable under section 2.710 of the Texas U.C.C. This holding accords with the policies underlying the Texas U.C.C. which allow the parties to vary the effects of Code provisions by agreement. *See* Tex. Bus. & Com.Code Ann. § 1.102(c) (Tex. UCC) (Vernon 1968); *Jon–T Chem., Inc. v. Freeport Chem. Co.*, 704 F.2d 1412, 1416 (5th Cir.1983) (per curiam).

Permian's claims for attorneys' fees are discussed in connection with the appeal from the magistrate's order, *infra*.

#### b) Pemex's credits.

█ The district court held that Pemex was entitled to a credit for any of Permian's debt to DIB that Pemex pays as conversion damages. The parties do not appeal this ruling. However, on remand, this credit must be recalculated because the district court erred in calculating DIB's conversion damages. The district court estimated that Pemex's credit for the conversion damages would be worth "about 6.3 million dollars." This figure represented the value of the collateral plus prejudgment interest. Inclusion of prejudgment interest in Pemex's credit was error. Prejudgment interest on the conversion claim compensates DIB for the income-earning potential of the converted collateral from the date of conversion. It represents damages incurred by DIB as a result of Pemex's conversion. It does not represent

any Permian debt to DIB. It should not have been credited to Pemex.

Pemex is entitled to a credit for its offset under the August 12, 1983 agreement which the district court held was worth "approximately five million" dollars. No attempt was made to calculate Pemex's credit with any degree of accuracy. We are unable to review the judgment without this calculation. We have expressed the formula for Pemex's credit under the August 12, 1983 agreement as follows:

The value of Pemex's credit = the value of $2 \times [$ (the amount of LPG delivered under the agreement) − (the amount of LPG Pemex owed at the time of the agreement) $]$.

On remand, the district court is directed to calculate Pemex's credit by doubling the difference in values between what Pemex delivered under the August 12, 1983 agreement and what Pemex owed at the time of the agreement. The parties stipulated that Pemex delivered 4,024,606 gallons of propane, 508,814 gallons of butane, and 55,117 gallons of natural gasoline under the agreement. The district court did not determine the dollar value of these deliveries. On remand, the district court should make this determination to facilitate the necessary comparison between what Pemex delivered and what Pemex owed.

The amount of LPG that Pemex owed at the time of the agreement is determined by subtracting the truck deliveries from the quantity of LPG that was disputed at the time of the agreement. The truck deliveries were stipulated to be 3,429,319 gallons of propane and 1,150,589 gallons of butane. The disputed quantities of LPG at the time of the agreement were 4,024,606 gallons of propane, 508,814 gallons of butane, and 55,117 gallons of natural gasoline. Because the truck deliveries do not match the quantities of LPG in dispute at the time of the agreement, it will be necessary to convert these amounts of LPG to dollar values. In the event that the dollar value of the truck deliveries exceeds the dollar value of the disputed quantities, the August 12, 1983 agreement provides that Pemex's credit for "excess LPG received by IDEC

under [the] Agreement" should be double the dollar value of the deliveries made under the agreement.

On remand, the district court is directed to determine the appropriate dollar values for the amount Pemex owed at the time of the agreement, the truck deliveries, and the deliveries made pursuant to the agreement. The parties ought to be able to stipulate these values. If they cannot, and proof is lacking or confusing, the district court may be required to make the best calculation possible based on additional evidence or available information.

D. Attorneys' fees—appeal from magistrate's order.

Both Pemex and Permian claimed attorneys' fees based on the district court's rulings that Pemex breached contracts with Permian and that Pemex's credits exceeded Permian's damages. The district court referred the attorneys' fees issues to the magistrate. We need not reach the issue raised here as to whether the magistrate's action was properly appealed. Because we remand for recalculation of Pemex's credits and Permian's damages, and because the district court must make findings necessary for an appropriate determination of whether Pemex breached contracts, we vacate the magistrate's attorneys' fees order and remand the attorneys' fees issue to the district court.

III. Conclusion.

The summary judgment in favor of DIB is affirmed. The remaining judgments of the district court and magistrate are vacated and the cause is remanded for further proceedings in accordance with this opinion. We intimate no views on any issue remanded.

AFFIRMED in part and VACATED AND REMANDED in part.