United States Court of Appeals,
Fifth Circuit.

No. 92-1684.

AMARILLO NATIONAL BANK, Plaintiff-Appellant,

v.

KOMATSU ZENOAH AMERICA, INC., Defendant-Appellee.

May 25, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before POLITZ, Chief Judge, GOLDBERG, and JONES, Circuit Judges.

GOLDBERG, Circuit Judge:

The Amarillo National Bank ("Bank") appeals the district court's denial of its conversion claim against Komatsu Zenoah America, Inc. ("KZA"). The Bank sued KZA for conversion, alleging that KZA wrongfully obtained possession of certain merchandise, in which the Bank has a perfected and superior security interest, from the Connally Implement & Supply Co., Inc. ("CISCO"). The district court, hearing this case under diversity jurisdiction and applying Texas law, held that the Bank consented to the transfer of the merchandise from CISCO to KZA and granted KZA's motion for summary judgment. Because we find that the Bank did not consent to the transfer of the merchandise from CISCO to KZA, we reverse.

FACTS

The facts leading up to the Bank's conversion claim against KZA are undisputed. Shortly after the Bank made a $700,000 loan to CISCO, CISCO filed for Chapter 11 bankruptcy. As part of CISCO's "Plan of Reorganization," which was approved by the bankruptcy court, CISCO executed two notes payable to the Bank. The two notes were secured by a written security agreement granting the Bank a security interest in "all inventory, accounts, notes, proceeds, [and] goods" owned by CISCO. The Bank perfected its security interest on February 23, 1987, by filing its financing statement in the office of the Secretary of State of Texas.

CISCO was a distributer of RedMax lawn care products, which it purchased from KZA.

Sometime after the Bank perfected its security interest in CISCO's inventory, CISCO transferred to KZA its stock of RedMax products, which CISCO had previously purchased from KZA on credit. In return for the RedMax products, KZA issued credit memoranda to CISCO in partial satisfaction of CISCO's pre-existing debt to KZA.

The Bank's perfected security interest in CISCO's inventory included the RedMax products transferred from CISCO to KZA. The Bank's filing of its financing statement in the office of the Secretary of State of Texas put KZA on notice of the Bank's security interest in the transferred RedMax products. Although KZA, as the seller of the RedMax products, could have obtained a superior "purchase money security interest" in the goods at issue, KZA failed to perfect this interest because it did not file a financing statement in the office of the Secretary of State of Texas.

The Bank maintains that given its perfected security interest in the RedMax products, KZA's possession of the RedMax products constitutes conversion. KZA counters the Bank's charges by claiming that the Bank relinquished its security interest in the RedMax products by authorizing the transfer of the RedMax products from CISCO to KZA and thus cannot maintain an action for conversion.

## ANALYSIS

Texas law defines conversion as "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Permian Petroleum Co. v. Petroleos Mexicanos,* 934 F.2d 635, 651 (5th Cir.1991) (quoting *Waisath v. Lack's Stores, Inc.,* 474 S.W.2d 444, 446 (Tex.1971)). The Bank alleges that KZA is liable for conversion because it is wrongfully exercising dominion and control over the RedMax merchandise, which the Bank claims is inconsistent with the Bank's security interest in the RedMax products.

Assessing the merit of the Bank's conversion claim requires a determination of whether the Bank's security interest in the RedMax products survived the transfer of the collateral from CISCO to KZA. Under Texas law, "a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement." Tex.Bus. & Comm.Code § 9.306(b). *See also Montgomery v. Fuquay-Mouser, Inc.,*

567 S.W.2d 268, 270 (Tex.Civ.App.1978) ("The security interest continues in collateral after it is sold unless the disposition was authorized by the secured party"). Absent such authorization, "the transferee takes subject to the security interest [and] the secured party may repossess the collateral from him or in an appropriate case maintain an action for conversion." § 9.306(b) Official Comment 3. *See also Montgomery v. Fuquay-Mouser, Inc.,* 567 S.W.2d at 270 ("the transferee takes subject to the security interest and the secured party may maintain an action against him"); *Chrysler Credit Corp. v. Malone,* 502 S.W.2d 910, 914 (Tex.Civ.App.1973) ("In the event of an unauthorized sale, the Texas Business and Commerce Code authorizes the secured creditor to maintain an action for conversion against the transferee").

As the Bank's security interest in the RedMax products survived the transfer of the collateral from CISCO to KZA only if the Bank did not authorize the transfer, the district court correctly concluded that "the only real issue" to resolve is whether the transfer of the RedMax products occurred "without the Bank's consent." The district court also correctly noted that "this question is answered as a matter of law by proper interpretation of the Bank's security agreement" with CISCO.

Both parties agree that the security agreement is unambiguous. "Interpretation of an unambiguous contract is an issue of law which we review de novo." *Permian Petroleum Co. v. Petroleos Mexicanos,* 934 F.2d 635, 650 (5th Cir.1991); *see also Webb Carter Constr. Co. v. Louisiana Central Bank,* 922 F.2d 1197, 1199 (5th Cir.1991) ("Our review of questions of law, including as here unambiguous contracts, is *de novo*").

In determining whether the Bank consented to the transfer of the RedMax products, the critical language of the security agreement is found in Paragraph E.2, which provides in relevant part:

> Debtor will not (*without Bank's consent* ): remove the collateral from the location specified herein; allow the collateral to become an accession to other goods; sell, lease, otherwise transfer, manufacture, process, assemble, or furnish under contracts of service, the collateral, *except goods identified herein as inventory.* (emphasis added)

KZA's contention that the Bank consented to the transfer of the RedMax products from CISCO to KZA is premised on the security agreement's clause excepting from the general prohibition of unauthorized transfers "goods identified herein as inventory." KZA claims that the transferred RedMax products were "inventory," and thus, under the plain language of the security agreement,

the Bank authorized the transfer at issue.

The court below agreed with KZA's interpretation of the security agreement. Referring to Black's Law Dictionary for guidance in determining the "ordinary meaning" of the term "inventory," the district court concluded that the transfer of the RedMax products from CISCO to KZA was a transfer of inventory within the meaning of the security agreement, and as such the transfer was authorized by the Bank.

In reviewing the district court's interpretation of the security agreement, we note as a threshold matter that the district court erred in interpreting the terms of the security agreement by reference to Black's Law Dictionary. Paragraph G of the security agreement provides that "*definitions in the Uniform Commercial Code apply to words and phrases in this agreement.*" Once a contract directs us to the white pages of the U.C.C., Black's definitions are exiled from our interpretive realm. The terms of the security agreement must be interpreted by reference to the U.C.C. Specifically, we must determine whether the transferred RedMax products constitute "inventory" under the U.C.C.

The term "inventory" is specifically defined in the U.C.C.:

> Goods are (4) "inventory' if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if has so furnished them, or if they are raw materials, work in the process or materials used or consumed in a business. § 9.109(4).[1]

Official Comment 3 to § 9.109 further explicates the meaning of inventory: "The principal test to determine whether goods are inventory is that they are held for immediate or ultimate sale. Implicit in the definition is the criterion that the prospective sale is in *the ordinary course of business.*" (emphasis added)

In a case involving the identical issue of interpreting the meaning of "inventory" under the U.C.C., *In re Del Tex Corp,* 32 Bankr. 403 (Bankr.W.D.Tex.1983), the bankruptcy court held that transferred goods are inventory under the U.C.C. only if the goods are transferred in the ordinary course of business. In *Del Tex,* the bank had a security interest in South Texas Company's

---

[1]All U.C.C. citations refer to the Texas version of the U.C.C. found in the Tex.Bus. & Com.Code (Vernon 1991).

merchandise, and the security agreement provided that South Texas would not sell its merchandise without the bank's consent "*except for goods identified as inventory.*" South Texas transferred some its merchandise to the Del Tex Corporation. In order to decide whether the bank's security interest in South Texas' merchandise survived the transfer of the merchandise from South Texas to the Del Tex corporation, the *Del Tex* court had to determine whether the transferred merchandise constituted "inventory." Referring to U.C.C. § 9.109 Official Comment 3, the court held that under the U.C.C. inventory is defined as merchandise sold in the "ordinary course of business." The court explained that

> [the] authorization issue is resolved by deciding whether the purported sales were in the ordinary course of business ... [because] if the sale is not in the ordinary course of business, the goods transferred are not, by definition, inventory, and consequently the transfer falls outside the scope of the grant of authority. *Id.* at 406-407.

As the security agreement at issue adopts the U.C.C.'s definition of inventory, and as § 9.109 of the U.C.C. defines inventory as goods held for sale in the ordinary course of business, the RedMax goods at issue were "inventory" only if they were transferred to KZA in the ordinary course of business. The U.C.C. defines buying in the ordinary course of business to be:

> for cash or by exchange of the other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale *but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.* § 1.201(9) (emphasis added)

The transfer of the RedMax products from CISCO to KZA was in partial satisfaction of CISCO's money debt to KZA. Thus, under the explicit terms of the U.C.C.'s definition, the transfer was not in the ordinary course of business. In *Crocker National Bank v. Ideco,* 889 F.2d 1452 (5th Cir.1989) *cert. den.* 495 U.S. 919, 110 S.Ct. 1949, 109 L.Ed.2d 312 (1990), the T.O.S. Co. made a bulk transfer of engines to its supplier Ideco, and in return Ideco gave T.O.S. credit memoranda releasing T.O.S. from debt obligation. The Crocker Bank had a perfected security interest in T.O.S.'s inventory which prohibited T.O.S. from selling its inventory unless the sale was in the ordinary course of business. The bank did not authorize the bulk transfer and sued Ideco for conversion. We held that "the transfer of the engines back to Ideco was not in the ordinary course of T.O.S.'s business," explaining:

[t]he parties agree t hat the U.C.C. and the security agreement definition of sales in the ordinary course of business are the same. Section 1.209(9) excludes from the definition of "buyer in ordinary course of business' one who receives property "in total or partial satisfaction of a money debt.' Ideco received the engines in satisfaction of the money debt T.O.S. owed, so this sale does not qualify. *Id.* at 1454.

Similarly, in *Permian Petroleum Co. v. Petroleos Mexicanos,* we explained that "under § 1.201(9), one who transfers goods in total or partial satisfaction of a money debt is not a [buyer in the ordinary course of business]." 934 F.2d at 648. Accordingly, we held in *Permian Petroleum* that Pemex was not a buyer in the ordinary course of business when it received merchandise in return for partial satisfaction of the transferor's debt. *Id.* at 649.

Applying U.C.C. sections 9.109(4) and 1.201(9) to the facts of the instant case, we conclude that the transfer of the RedMax products from CISCO to KZA, for partial satisfaction of CISCO's pre-existing money debt to KZA, was not in the ordinary course of business. Because the RedMax products transferred from CISCO to KZA were not transferred in the ordinary course of business, the goods were not "inventory" under the U.C.C. and the security agreement. The RedMax merchandise could properly be classified as "inventory" while on CISCO's shelves waiting to be sold in the ordinary course of business. However, the merchandise lost its inventory status under the U.C.C. when it was transferred to KZA, not in the ordinary course of business, but in satisfaction of pre-existing debt.

Because the transferred RedMax merchandise was not inventory, the Bank did not authorize the transfer of the RedMax merchandise from CISCO to KZA. Interpreting the security agreement as not authorizing the transfer of the RedMax products from CISCO to KZA for satisfaction of CISCO's pre-existing debt is not only supported by U.C.C. definitions and cases applying these definitions, but also by a common sense understanding of the security agreement. If the security agreement is construed as authorizing all transfers of inventory merchandise, regardless of whether the merchandise is transferred in the ordinary course of business, the Bank's security interest in CISCO's merchandise would be rendered meaningless. It does not require an MBA to appreciate that collateral which can be disposed of at the will of the debtor provides no security to the lender. For example, if the debtor transfers the collateral to satisfy the debtor's pre-existing unsecured debt, the

debtor receives no "new value" to replace the transferred collateral and the lender's security interest disappears with no substitute.

By contrast, if the security agreement is construed as authorizing the transfer of inventory—defined as merchandise sold in the ordinary course of business—the Bank's security interest in CISCO's merchandise would not be jeopardized by a transfer of inventory because CISCO would receive *new value,* in the form of accounts receivable, to replace the transferred inventory. In such a case the Bank would not lose its collateral; rather, its collateral would simply take a different form. As we explained in *Permian Petroleum Co.,* "if the purchaser is a [buyer in the ordinary course of business], the inventory financier is protected to the extent that the security interest continues in the new value as proceeds." 934 F.2d 649.

Because the Bank possessed a perfected security interest in the RedMax products and did not authorize their transfer from CISCO to KZA, we conclude that the Bank presented a valid claim for conversion against KZA. Our conclusion is consistent with the Texas Business & Commerce Code which establishes that a perfected secured creditor, like the Bank in the instant case, takes priority over an unsecured seller. U.C.C. §§ 9.301 and 9.312. *See e.g. Crocker National Bank v. Ideco,* 889 F.2d at 1453 (applying Texas law, finding bank's "right to the engines as holder of a perfected interest was superior to [transferee's] claim as unpaid seller no longer in possession").

## CONCLUSION

We conclude that the Bank presented a valid claim for conversion against KZA and is entitled to recover conversion damages. "Conversion damages are the value of the converted property on the date of conversion plus prejudgment interest." *Permian Petroleum Co.,* 934 F.2d at 651. The district court noted in passing that "the value of the property here is hotly disputed, and cannot be measured at this stage of the proceedings." We remand the determination of the conversion damages to the district court.

For the foregoing reasons the judgment of the district court is REVERSED, and the case is REMANDED for a determination of damages consistent with this opinion.