#24431-a-RWS

**2007 SD 105**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

FIN-AG, INC.,                                  Defendant, Third Party
                                               Plaintiff and Appellant,

v.

FELDMAN BROTHERS,                              Defendant and Appellee,

and

NBP, INC., and HAAS LIVESTOCK
SELLING AGENCY, INC.,                          Third Party Defendants
                                               and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF

THE SIXTH JUDICIAL CIRCUIT

HYDE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JAMES W. ANDERSON
Judge

* * * *

ARGUED AUGUST 30, 2007

OPINION FILED **10/17/07**

ROBERT M. NASH of
Wilson, Olson & Nash, P.C.
Rapid City, South Dakota

Attorneys for defendant, third party
plaintiff and appellant.

DANIEL A. BECKMAN of
Gislason & Hunter, LLP
Minneapolis, Minnesota

and

JAMES M. CREMER of
Bantz, Gosch & Cremer, LLP
Aberdeen, South Dakota

Attorneys for defendant and
appellee Feldman Brothers, and
third party defendants and
appellees, NBP, Inc. and Haas
Livestock Selling Agency, Inc.

#24431

SABERS, Justice.

[¶1.] Fin-Ag appeals the trial court's dismissal of its conversion claims against NBP, Inc. (NBP), a Minnesota corporation, Feldman Brothers (Feldman), and Haas Livestock Selling Agency (Haas Livestock) for more than $327,000. Fin-Ag claims it has a security interest in Nathan Shaull's (Shaull) accounts receivable and NBP's settlement of its account debt for cattle feed by trading 393 head of cattle to HS Cattle[1] and Shaull did not extinguish NBP's and Feldman's responsibility for the debt. We affirm the trial court's dismissal of the conversion claims.

## FACTS

[¶2.] From 1996 until 2002, Shaull received financing from Fin-Ag to support his farming operation. Fin-Ag would examine Shaull's farming operations and financial condition to determine a limit, which, in 2001, was set at two million dollars. Fin-Ag did not provide prior financing for the purchase of cattle. Instead, it appears as long as Shaull was under the two million dollar limit, he could purchase cattle, then send Fin-Ag documentation for the purchases and obtain financing. Fin-Ag did not inspect the cattle prior to lending the money, but conducted inspection of the collateral later.

[¶3.] Each time Shaull sought financing for a new project there would be a new promissory note and security agreement for that individual project. Fin-Ag filed a blanket UCC filing covering all of the projects. Fin-Ag did not require prior permission to sell the collateral, nor did they require notice to be given to Fin-Ag

---

1. HS Cattle is Shaull's cattle broker business. *Infra* ¶7.

prior to selling. Fin-Ag did not require that the checks from the proceeds of the collateral be made jointly to Shaull and Fin-Ag. Most often, the cattle in which Fin-Ag held a security interest were sold at Highmore Auction Sales (Highmore Auction) or through HS Cattle[2] and then Shaull would later bring the check to Fin-Ag to make a payment on his debt.

[¶4.] During the times relevant to this proceeding, Fin-Ag was not personally inspecting the cattle. It hired Scott Gilbertson, an employee of the Cenex Harvest State's Feed Division,[3] to do the inspections. Gilbertson conducted all collateral inspections from August 2001 until April 2002. He was instructed to document: "the borrower; the project number; the loan type; the location of livestock; the inventory; feed stuffs; livestock location by pen, sex, head, weight, $/cwt and value; the condition of the livestock; the location and diagram of ear tags; the risk management position; and [to provide] a certification that the inspector personally viewed the collateral and certified the report accurately represented the feed stuffs and livestock inventory of the borrower/feeder."

[¶5.] When Gilbertson received the requests to do the collateral inspections, the requests would only include the borrower name and the project number. Gilbertson would inform Shaull that he was going to do an inspection and Shaull would take Gilbertson to various locations to show him the collateral. Shaull would identify certain cattle as his, the loan number corresponding to the cattle, and

---

2.    Shaull owned both Highmore Auction and HS Cattle. *Infra* ¶7.

3.    Fin-Ag is a subsidiary of Cenex Harvest States.

estimate the number and weight of the cattle. Gilbertson would agree with Shaull's estimations and never documented any more information. Sometimes Gilbertson documented that an inspection of certain cattle had taken place where no inspection of any cattle occurred.[4] The inspection reports typically only included the location,[5] the number and the weight of the cattle.

[¶6.] Fin-Ag knew that Shaull did not own the land where the cattle were kept. Shaull did not provide any documentation to prove he was leasing the land. Fin-Ag did not conduct any UCC searches on owners of the land or do any custodial filings on these locations. The security agreement provided that Fin-Ag required Shaull to identify the cattle with yellow ear tags it provided. No ear tags were used and none of the cattle inspected were identified by the tags or by any other marks. Gilbertson took Shaull's word that the cattle were owned by him as true.

[¶7.] In addition to his personal farming operation, Shaull owned a public auction barn in Highmore, South Dakota, incorporated under the name Highmore Auction Sales, Inc. He was also a licensed and bonded cattle broker under the name HS Cattle. Fin-Ag was aware of these other businesses and that Shaull bought, sold and fed cattle in the capacity of HS Cattle and Highmore Auction. Many times,

---

4.  For example, one inspection report indicated Gilbertson inspected 779 head of cattle at the Onida feedlot; however, he had never been to the Onida feedlot. The trial court noted there was a time where 1253 cattle were allegedly inspected, but Gilbertson only actually viewed 300. He completed the report based on representations from Shaull.

5.  The location was not documented every inspection. On the occasions it was documented, the location was not exact, but an approximation. For example, one inspection noted the location of the collateral was west of Highmore.

Shaull would request disbursements from Fin-Ag by showing hand-written invoices from HS Cattle or Highmore Auction that claimed Shaull had purchased cattle through these entities. Without verifying that any sellers had actually sold cattle to HS Cattle or Highmore Auction, Fin-Ag would provide payment to these entities for Shaull's purchase of cattle. Yet Fin-Ag did not take a security interest in any assets connected to HS Cattle or Highmore Auction, nor did it loan any money to these separate entities.

[¶8.] From November 2001 to February 2002, NBP bought cattle in Montana through Lake Area Livestock[6] and Highmore Auction. Shaull convinced NBP and Feldman to keep their cattle at various feedlots around Highmore. Shaull was responsible for paying for the feed for these cattle and would be reimbursed by NBP and Feldman for the cost of the feed plus interest. Fin-Ag alleges that NBP and Feldman contracted with Shaull in his individual capacity as a farmer, while NBP and Feldman contend they contracted with HS Cattle as a separate entity.

[¶9.] Around April 17, 2002, NBP moved the cattle from the feedlots around Highmore to Brake feedlot in Minnesota. Norman Beckman, the head of NBP, testified they decided to move the cattle to the Minnesota feedlot because they were getting too "fleshy." Shaull had a $6,000 balance for feed at the Ogle feedlot. NBP paid the $6,000 directly to Ogle in order to be able to move the cattle to Minnesota.

---

6. Lake Area Livestock is a commission firm owned by Randy Unger out of Watertown, South Dakota. It has no connection with Shaull, HS Cattle or Highmore Auction. Beckman testified that the cattle purchased in Montana were placed at the Ogle feedlot per an arrangement negotiated by him with Ogle. They did not deal with Shaull for this livestock feeding placement.

NBP also owed $205,933.90 and Feldman owed $121,492.50 to Shaull in connection with the feeding arrangement. To settle both debts in full, NBP "sold" Shaull 393 head of cattle. Feldman paid its share ($121,492.50) to Haas Livestock,[7] which in turn paid $121,492.50 to NBP. This represented the feed debt NBP paid with cattle on Feldman's behalf. This deal was documented on an HS Cattle invoice.

[¶10.] Later in April of 2002, Fin-Ag became concerned about the sufficiency of collateral to secure Shaull's line of credit of almost two million dollars. Fin-Ag attempted to collect its collateral, but none of the cattle in which Fin-Ag had a security interest could be found.[8] Other creditors discovered the lack of collateral and litigation ensued to recover the collateral and establish priorities.[9]

[¶11.] ***a. initial litigation***

[¶12.] This appeal originated when American Bank & Trust (American) sued Nathan and Deborah Shaull and Fin-Ag, alleging it held a security interest in certain cows and calves. Feldman and its lender, AgStar Financial Services

---

7. Beckman testified that NBP handles almost all its sales and transactions through Haas Livestock. NBP runs its transactions through Hass "[j]ust as a bookkeeping process that we tried to do to handle everything through and keep a trail on."

8. Almost 4000 head of cattle were missing. Fin-Ag received payment from some sources, but is still owed about 1.6 million dollars.

9. American Bank & Trust sued Shaull and Fin-Ag. Hyde County Civ. No. 02-20. Fin-Ag discovered other parties had purchased feeder cattle from entities owned by Shaull. Fin-Ag assumed its security interest attached to these feeder cattle and brought the parties in as third-party defendants. The action was divided into three parts by consent of the parties. This appeal only concerns the cross-claim against Feldman and its third-party complaint against NBP and Haas.

(AgStar), intervened and claimed an interest in the cows and calves. This Court affirmed the lower court holding that American had "a valid perfected first security interest to the collateral, that Fin-Ag [had] a valid perfected security interest subject to American's interest, [and] that any ownership claim of Feldman or security interest of AgStar [was] subordinate and inferior to the perfected security interest of American and Fin-Ag." American Bank & Trust v. Shaull, 2004 SD 40, ¶2, 678 NW2d 779, 781.[10]

[¶13.] ***b. litigation involving current parties and first appeal***

[¶14.] During the initial litigation, Fin-Ag amended its pleadings to bring a cross-claim against Feldman and a third-party complaint against NBP and Haas Livestock claiming a security interest in 1,097 head of cattle and a conversion claim for the $327,426.90 from the feeding arrangement. The parties made cross-motions for summary judgment. The trial court denied Fin-Ag's motion for summary judgment and granted the motion in favor of NBP. Fin-Ag appealed and this Court reversed and remanded for trial.[11]

---

10. As part of that litigation, the court found Shaull had sufficient interest in Feldman's cattle under the written bred cow/calf agreement to subject Feldman's cattle to Fin-Ag's security interest. Therefore, Feldman paid $121,492.50 for feed for cattle that it thought it owned but never received.

11. On appeal, this Court found the matter was not a final judgment and it lacked certification under SDCL 15-6-54(b). While the decision did not reach the merits of the issues related to the propriety of granting summary judgment, this Court noted there appeared to be genuine issues of material fact which precluded summary judgment. In an effort to provide guidance, we noted the following issues appeared to be genuine issues of material fact that needed exploration at trial:

(continued . . .)

**[¶15.]** *c. litigation involving current appeal*

**[¶16.]** On remand, a bench trial was held on August 29, 2006 where the trial judge heard witnesses and received evidence. The trial court ruled against Fin-Ag on both issues. First, it found that Shaull did not own the 1,097 cattle, that he had

_____

(. . . continued)

1. Whether the feeder cattle claimed to have been purchased by NBP, Inc. from Shaull through HS Cattle were owned by Shaull, whether the feeder cattle claimed to have been purchased by NBP from Shaull through Highmore Auction were owned by Shaull, and whether Shaull ever possessed sufficient rights in said cattle to subject them to any security interest of Fin-Ag.
2. The nature and extent of Shaull's interest in the collateral at issue. For example, were Shaull's rights limited to reimbursement of feed costs?
3. Whether Shaull was a person engaged in farming operations, and whether any feeder cattle claimed to have been purchased by NBP from Shaull were farm products.
4. Whether the feeder cattle claimed by NBP were located at the same locations as the feeder cattle in which Fin-Ag claimed a security interest, whether Fin-Ag ever inspected the feeder cattle claimed by NBP, whether Fin-Ag's inspections were conducted in a commercially reasonable and timely manner, and whether there were feeder cattle in existence upon which Fin-Ag could enforce its security interest, if any.
5. Whether NBP performed any act which led Fin-Ag to believe that Shaull was the owner of the feeder cattle at issue, and if so, the specific act or acts of NBP upon which Fin-Ag detrimentally relied to establish estoppel.
6. Whether Fin-Ag ever knew the feeder cattle at issue were in South Dakota, and whether Fin-Ag extended any credit in reliance upon a security interest in the feeder cattle at issue.
7. Whether any failure of Fin-Ag to brand or tag the feeder cattle in which it claimed a security interest precludes or defeats any such claimed security interest of Fin-Ag in any feeder cattle claimed by NBP.
8. Whether Shaull exercised possession and control, if any, over the feeder cattle claimed by NBP and the nature and extent of that possession and control, if any.
9. Whether Fin-Ag has a perfected security interest in any account receivable or receivables which were owed to Shaull by NBP and/or Feldman for care and feeding of feeder cattle, whether any such obligation to Shaull was paid or discharged by any transfer by NBP of feeder cattle to Shaull, and whether any feeder cattle claimed to have been transferred to Shaull by NBP were actually in existence at the time of the transfer.

no control over the cattle, that he was only to receive reimbursement for purchasing feed, and that he did not acquire sufficient rights in the cattle to grant a security interest. The court found that Fin-Ag did not rely to its detriment on any of NBP's actions and NBP was not estopped from asserting its ownership rights in the 1,097 head of cattle. This ruling was not appealed.

[¶17.] Next, the trial court found that NBP entered into the feeding arrangement with Shaull in his capacity as a cattle broker as HS Cattle, and not as Nathan Shaull, an individual farmer. Therefore, Fin-Ag did not have a security interest in the $327,426.90 account receivable owed to HS Cattle as Fin-Ag did not have a security interest in HS Cattle's assets. The trial court also found that Shaull's acceptance of 393 head of cattle in the ordinary course of business satisfied the accounts receivable debt owed by NBP and Feldman. Finally, the trial court concluded Fin-Ag waived any security interest in the account receivable through its course of conduct.

[¶18.] Fin-Ag appeals the part of the trial court's decision relating to the account receivable. We summarize the issues as:

> 1. Whether NBP contracted with Shaull in an individual capacity or in his capacity as a cattle broker, HS Cattle and whether Fin-Ag's security interest attached to NBP's feed debt as an account receivable.
>
> 2. Whether the trial court erred when it dismissed Fin-Ag's conversion claims because it found the transfer of 393 cattle satisfied the feed debt.
>
> 3. Whether the trial court erred when it dismissed Fin-Ag's claims based on waiver.
>
> 4. Whether Shaull's false representation to his lenders causing Feldman to be equitably estopped from claiming ownership in

its livestock extinguished any debt owed by Feldman to Shaull for feed and care of the livestock.

## STANDARD OF REVIEW

[¶19.]     Our standard of review is well established:

> We review the circuit court's findings of fact under the clearly erroneous standard. Under this standard, we will only reverse when we "are left with a definite and firm conviction that a mistake has been made" after a thorough review of the evidence. We review conclusions of law under the de novo standard without deference to the circuit court.
>
> In applying the clearly erroneous standard, our function is not to decide factual issues de novo. The question is not whether this [C]ourt would have made the same findings that the trial court did, but whether on the entire evidence we are left with a definite and firm conviction that a mistake has been committed. This [C]ourt is not free to disturb the lower court's findings unless it is satisfied that they are contrary to a clear preponderance of the evidence. Doubts about whether the evidence supports the court's findings of fact are to be resolved in favor of the successful party's "version of the evidence and of all inferences fairly deducible therefrom which are favorable to the court's action."

*American Bank & Trust*, 2004 SD 40, ¶11, 678 NW2d at 783 (internal citations omitted).

[¶20.]     Fin-Ag has not appealed the trial court's ruling that NBP owned the 1,097 head of cattle. The court ruled that these cattle are not subject to Fin-Ag's security interest because Shaull did not have sufficient rights in the collateral to grant a security interest. Furthermore, the trial court decided against Fin-Ag's claim that NBP was estopped from asserting ownership because NBP did not commit an act that led Fin-Ag to believe Shaull was the owner of the cattle. The

trial court also found Fin-Ag did not rely on any of NBP's actions to its detriment when it extended credit to Shaull.

[¶21.]    Therefore, the only issues to be decided relate to the accounts receivable.

[¶22.]    **1.    Whether NBP contracted with Shaull in an individual capacity or in his capacity as a cattle broker, HS Cattle and whether Fin-Ag's security interest attached to NBP's feed debt as an account receivable.**

[¶23.]    NBP claims the feeding arrangements were handled by HS Cattle and not Shaull, as a farmer.  NBP claims that Fin-Ag does not have a security interest in HS Cattle's account receivable since Fin-Ag did not loan any money to HS Cattle or take any interest in HS Cattle's assets.  Fin-Ag argues that NBP and Feldman dealt with Shaull as a farmer; therefore, Fin-Ag has a first perfected security interest in the account receivable, which is the $327,426.90 feed debt owed to Shaull by NBP and Feldman.  Fin-Ag also claims that NBP, Feldman, and Shaull could not agree to settle the account by selling Shaull 393 head of cattle[12] in lieu of money. According to Fin-Ag, NBP, Feldman and Haas owe it $327,426.90.

[¶24.]    The trial court found NBP dealt with Shaull's entity, HS Cattle, and not with Shaull, the individual farmer.  This was in part because the feeding agreement between HS Cattle and NBP was documented on an HS Cattle invoice. Beckman testified Shaull arranged for NBP and Feldman to feed their cattle at various feedlots around Highmore.  NBP and Feldman argue that this arrangement fostered good will towards Shaull by the feedlots that in turn, may run some cattle

---

12.    Apparently, these 393 cattle disappeared as well.

through Shaull's Highmore Auction. Furthermore, other entities like NBP and Feldman may sell their cattle that they left in nearby feedlots at Highmore Auction. Finally, Shaull paid feed bills with checks from HS Cattle.

[¶25.] There was no evidence Shaull was a farmer as to these cattle. Dave Ogle testified he was the owner of the feedlot and he fed the cattle. Neither Shaull nor any of Shaull's employees fed or helped care for these cattle. Shaull's participation with these cattle was limited to paying the feed bill.

[¶26.] When reviewing findings of the trial court, we do not substitute our judgment. Indeed, "this [C]ourt is not free to disturb the lower court's findings unless it is satisfied that they are contrary to a clear preponderance of the evidence." *American Bank & Trust*, 2004 SD 40, ¶13, 678 NW2d at 784. Fin-Ag has not pointed to any credible evidence that demonstrates the trial court's finding that NBP dealt with Shaull as a broker, not a farmer, is clearly erroneous. After review of the record, nothing indicates the trial court's finding was erroneous. We affirm. Moreover, since NBP dealt with HS Cattle and Fin-Ag does not have a security interest in HS Cattle's accounts receivable, NBP's debt for feed for its cattle was not subject to a security interest.[13]

---

13. This holding is not meant to imply that a debtor may avoid his creditor's security interest simply by using a fictitious name, when the creditor is not aware the debtor is doing business using the fictitious name. However, this question is not presented here as Fin-Ag does not claim that they had a security interest in HS Cattle or Highmore Auction, even though they knew Shaull did business as these entities.

[¶27.]     However, in prior litigation it was determined that Feldman dealt with Shaull, the individual farmer and the cattle were farm products.[14] *American Bank & Trust*, 2004 SD 40, ¶18, 678 NW2d at 785. This finding has not been altered or reversed. Therefore, we examine issue 2 as it relates to Feldman.

[¶28.]     **2.     Whether the trial court erred when it dismissed Fin-Ag's conversion claims because it found the transfer of 393 cattle satisfied the feed debt.**

[¶29.]     Because, as we decided in Issue 1, Fin-Ag had no security interest in HS Cattle, with whom NBP dealt, this claim only applies to Feldman's debt or account with Shaull in the amount of $121,492.50. Essentially, Fin-Ag argues that the settlement of Shaull's account receivable with Feldman, by selling Shaull 393 cattle, did not satisfy the debt because the settlement was done without the knowledge or consent of Fin-Ag and constitutes a prohibited "debt settlement." It also claims Feldman was required to pay cash for the account and that Feldman was not a "buyer in ordinary course of business." Therefore, according to Fin-Ag, it is entitled to the $121,492.50 from Feldman.[15] Feldman argues that the transfer of the 393 cattle from NBP to Shaull satisfied the outstanding feed debt. According to Feldman, Fin-Ag's security interest may continue in the 393 head of cattle, but any security interest in the account receivable created by Feldman's feed debt is extinguished by NBP's payment in the form of cattle.

---

14.     Feldman actually placed cattle with Shaull for him to feed and care for the cattle. *American Bank & Trust*, 2004 SD 40, ¶5, 678 NW2d at 782.

15.     In actuality, Fin-Ag claims the right to the whole account receivable amount of $327,426.90 made up of NBP and Feldman's feed debt. However, as we

(continued . . .)

[¶30.]     1. *Payment of 393 cattle to Shaull satisfied the debt.*

[¶31.]     A review of case law reveals no case directly on point.  However, SDCL 57A-9-406 is helpful.  The statute provides in part:

> (a) Subject to subsections (b) through (i), an account debtor on an account, chattel paper, or a payment intangible *may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification*, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee.  After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.

SDCL 57A-9-406 (emphasis added).  Here, NBP, for Feldman, paid the debt by transfer of 393 head of cattle and satisfied any obligation to Shaull.  While this transaction does not involve an assignment, this statute is still relevant.  It provides that an account debtor may discharge its obligation by paying the person to which the debt is owed.  Neither NBP nor Feldman received notice to pay a different person than to whom they owed the debts.  NBP, for Feldman, paid Shaull and its obligation is discharged.

[¶32.]     At oral argument, Fin-Ag argued that an account debtor cannot make a payment on an account through any method other than money.  It claims if the account debtor pays in this manner, it is a "debt settlement" and the account debtor cannot get the buyer in ordinary course of business protection of SDCL 57A-9-320.  However, when asked, Fin-Ag could not cite any authority for the proposition that

_____

(. . . continued)

explained above, NBP did not deal with Shaull as a farmer, but as HS Cattle and Fin-Ag does not have a security interest in NBP's share.

an account debtor could only make a payment with money. Furthermore, the "buyer in the ordinary course of business" protection would be inapplicable as NBP and Feldman were making a payment on an account receivable, not "buying" the account receivable.

[¶33.] Fin-Ag cited *Farmers & Merchants State Bank v. Teveldal*, 524 NW2d 874 (SD 1994) and *Amarillo National Bank v. Komatsu Zenoah America, Inc.*, 991 F2d 273 (5thCir 1993) at oral argument in support of its argument that this was a "debt settlement" and not a payment on an account. These cases are distinguishable from the present case.

[¶34.] In *Teveldal*, a bank and a feed supplier claimed priority in competing security interests in hogs owned by a customer. 524 NW2d at 876. Teveldal provided the customer with $24,358.96 in hog feed. *Id.* When the customer did not pay, Teveldal called the Secretary of State's office and found the bank had a security interest in beef and dairy cattle. *Id.* Teveldal then filed a financing statement, perfecting a security interest in 600 head of the customer's hogs to secure the payment for the feed. *Id.*

[¶35.] This Court agreed with the lower court that Teveldal was not a "buyer in ordinary course" because "'[b]uying' does not include receiving goods under a preexisting contract as security 'for or in total or partial satisfaction of a money debt,' . . . thereby excluding 'attaching creditors and others who take goods in satisfaction of preexisting debts' from the definition of a 'buyer in ordinary course.'" *Id.* at 878 (quoting 2 J. White & R. Summers, Uniform Commercial Code, § 26-13, at 533, n2 (3d ed 1988)). This Court added that "[a] creditor who receives a security

interest for a preexisting debt is not a 'buyer in ordinary course.'" *Id.* In Fin-Ag's case, neither NBP nor Feldman received a security interest for a preexisting debt, but were paying their own debt, and *Teveldal* is inapplicable.

[¶36.] In *Amarillo National Bank*, the Bank had a security interest in Connally Implement & Supply Co., Inc.'s (CISCO's) "inventory, accounts, notes, proceeds, and goods." 991 F2d at 274. CISCO distributed RedMax lawn care products, which it purchased from Komatsu Zenoah America, Inc. (KZA). *Id.* CISCO had purchased RedMax products from KZA on credit. *Id.* After the Bank perfected its security interest, CISCO transferred its stock of RedMax products to KZA and KZA issued a credit memorandum to CISCO in partial satisfaction of CISCO's pre-existing debt to KZA. *Id.* The Fifth Circuit concluded the Bank had a valid claim for conversion against KZA because the stock was not inventory and the transfer was not authorized by the security agreement. *Id.* at 275. The court reasoned that:

> [I]f the debtor transfers the collateral to satisfy the debtor's pre-existing unsecured debt, *the debtor receives no "new value" to replace the transferred collateral and the lender's security interest disappears with no substitute.*
>
> By contrast, if the security agreement is construed as authorizing the transfer of inventory – defined as merchandise sold in the ordinary course of business – the Bank's security interest in CISCO's merchandise would not be jeopardized by a transfer of inventory because CISCO would receive *new value*, in the form of accounts receivable, to replace the transferred inventory. *In such a case the Bank would not lose its collateral; rather, its collateral would simply take a different form.*

991 F2d at 277 (emphasis added in part). Again, this case is factually distinguishable from Fin-Ag's case because "the debtor [Shaull] [did not transfer]

the collateral to satisfy the debtor's [Shaull's] pre-existing unsecured debt." *Id.*
Furthermore, *Amarillo National Bank's* rationale actually supports NBP's and
Feldman's position. Shaull received 393 head of cattle as payment on the account
debt. Fin-Ag did not lose its collateral (account receivable), but its collateral took a
different form. *See id.*

[¶37.] Finally, Fin-Ag argues that the 393 cattle did not exist when NBP and
Shaull entered into the agreement to sell Shaull the cattle to settle the feed debt.
This argument fails for lack of evidence. Fin-Ag also argues that NBP knew of
Shaull's financially precarious situation when it moved the cattle from the feedlots
to Minnesota. Thus, Fin-Ag claims that NBP cannot satisfy the debt because it is
not a buyer in the ordinary course of business.

[¶38.] However, Beckman from NBP testified they routinely inspected the
cattle and the cattle were there the last time they conducted an inspection. Ogle,
the owner of the feedlot where NBP's cattle were kept, confirmed personal
inspections by NBP and that he knew the cattle were owned by NBP. Plus, Ogle
testified that Shaull did not have any cattle at his feedlot during this time period
and NBP's were the only cattle at his feed lot from about the second week in
January until NBP moved its cattle to Minnesota in April. Both Ogle and Beckman
testified that NBP were moving the cattle because the cattle had become "fleshy"
and were to go to a feedlot in Minnesota instead of put on grass in South Dakota.
After hearing this testimony, the trial court entered findings of fact in line with
Ogle and Beckman's testimony. The trial court found,

> The movement of the cattle by NBP from the Ogle farm
> was done for business reasons, not because of any

> knowledge or concern over Shaull's financial condition.
> The agreement between Shaull was done in the ordinary
> course of business by Shaull in his capacity as a cattle
> broker with HS [Cattle] and NBP as a cattle feeder.

The trial court is the judge of credibility and it is the trial court's duty to weigh the testimony and resolve any conflicts. The trial court decided in favor of NBP and Fin-Ag has provided no evidence that this finding is clearly erroneous. The trial court did not err when it dismissed Fin-Ag's conversion claims because the transfer of 393 cattle to Shaull by NBP satisfied the feed debt.

[¶39.] In this case, Fin-Ag did not protect or maintain its collateral. As the trial court found,

> Fin-Ag permitted Shaull to sell its collateral without its
> prior approval. Fin-Ag permitted Shaull to sell its
> collateral at public auction or through private sale
> without requiring its name to be placed upon the
> proceeds. Only sometime later would it find out that the
> collateral had been disposed of by Shaull. At that time,
> Fin-Ag assumed that Shaull would come into its offices to
> account for the collateral disposition.

Furthermore, Fin-Ag knew Shaull farmed and managed two different businesses. It knew Shaull purchased and traded cattle through these two entities, yet took no steps to take a security interest in either business. Finally, Fin-Ag's inspections of the collateral amounted to little more than a rubber stamping of Shaull's assertions that he owned certain cattle located on certain properties.

[¶40.] Fin-Ag has no enforceable right to payment from NBP or Feldman for the feed debt. NBP sold 393 head of cattle to Shaull as payment for the total debt. Fin-Ag argues throughout its brief that its security interest continues under SDCL 57A-9-315(a)(1). While the security interest may continue, it does not continue in

the account receivable, as payment by NBP extinguished that debt. The security interest would continue in the proceeds of the account receivable, the 393 head of cattle sold to and owned by Shaull. *See* SDCL 57A-9-315(a)(1) ("(1) A security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and (2) A security interest attaches to any identifiable proceeds of collateral."). Moreover, due to the decision of issue 1, the security interest would only continue in the cattle relating to the $121,492.50 owed to Shaull by Feldman. As decided above, NBP dealt with HS Cattle and Fin-Ag does not have a security interest in HS Cattle's accounts receivable.

[¶41.] We affirm the trial court's rulings on issues 1 and 2. In light of our holdings, there is no need to reach issues 3 and 4.

[¶42.] Affirmed.

[¶43.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.