# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 9, 2024

Lyle W. Cayce
Clerk

No. 23-20520

———

Shinsho American Corporation,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

TransPecos Banks, SSB,

*Intervenor Defendant—Appellant/Cross-Appellee*.

———

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-577

———

Before King, Stewart, and Higginson, *Circuit Judges*.

Per Curiam:[*]

In 2016, HyQuality Alloys acquired two loans from Appellant TransPecos Banks that were secured by, among other collateral, an "all assets" lien on HyQuality's inventory. After HyQuality transferred a portion of proceeds from the sale of its inventory to Appellee Shinsho American Corporation, TransPecos sued Shinsho for conversion. The district court found that TransPecos authorized HyQuality to transfer those proceeds free

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

of TransPecos's security interest, thus defeating TransPecos's conversion claim. TransPecos appeals. We AFFIRM.

## I.

Appellee Shinsho American Corporation ("Shinsho") is an importer and distributor of various steel products that acquires steel from foreign steel mills and delivers it to customers for resale in the United States. One such customer is HyQuality Alloys, LLC ("HyQuality"). Shinsho and HyQuality began transacting business in 2015, whereby Shinsho would send HyQuality steel, and HyQuality would store that steel in a warehouse on Tamina Road in Montgomery County, Texas (the "Warehouse"), to later sell. Under this business arrangement, HyQuality would send a purchase order to Shinsho, and Shinsho would issue an invoice giving HyQuality thirty days to pay. These purchase orders contemplated that the steel was "freight on board," meaning that title to and risk of loss for the steel would remain with Shinsho until the steel was delivered to HyQuality. Once delivered to the Warehouse, title and risk of loss shifted to HyQuality. In other words, once Shinsho's steel was delivered to HyQuality, it became part of HyQuality's inventory— i.e., its property.

To finance its business dealings, HyQuality needed capital. Thus, in 2016, HyQuality sought financing through TransPecos Banks, SSB ("TransPecos"). TransPecos provided HyQuality with two secured loans: a $750,000 loan ("Smaller Loan") and a $3,829,000 loan ("Larger Loan"). The Smaller Loan was not guaranteed by the U.S. Small Business Administration ("SBA"), but the Larger Loan was an SBA Loan. The two loans were secured by, among other collateral, a Deed of Trust on the Warehouse and an "all assets" lien on HyQuality's inventory. This collateral

No. 23-20520

included inventory owned or thereafter acquired by HyQuality and any proceeds from the sale of collateral.[1]

Although TransPecos took HyQuality's inventory as collateral, TransPecos still "wanted [HyQuality] to sell its inventory because that's how it would generate money." Additionally, TransPecos did *not* "require [HyQuality] to use loan proceeds specifically to pay back the bank." In fact, TransPecos "specifically didn't want that kind of an arrangement because if [TransPecos] had that kind of arrangement, it would violate the SBA requirements for long-term loans." Moreover, if HyQuality had been required to pay down the loans from proceeds of the sale of inventory, HyQuality likely would have lacked sufficient cash flow to purchase additional inventory. Thus, because TransPecos would not consistently be paid out of sales proceeds, it protected its financial interests by including a covenant in HyQuality's loan documents that required HyQuality to maintain, at all times, a minimum inventory.

From 2015 to 2017, the business arrangement between HyQuality and Shinsho appeared fruitful—HyQuality's business performance was "profitable" and "cashflow positive." However, in 2018, HyQuality began having financial difficulties. The oil and gas industry experienced a downturn, and the U.S. government's imposition of a new tariff on steel increased steel prices. As a result, HyQuality's customers began putting their orders on hold. Yet, from 2017 to 2018, Shinsho continued to sell a significant amount of steel to HyQuality.

---

[1] On September 9, 2016, TransPecos filed a UCC filing statement—which included HyQuality's inventory—with the Texas Secretary of State to perfect its security interest in the property designated as collateral, and on July 1, 2021, TransPecos filed a UCC continuation. There is no evidence that Shinsho made any filings to perfect any security interest in any of the steel in the Warehouse.

Due to these financial struggles, HyQuality fell behind on paying Shinsho's invoices. To remedy this problem, on February 21, 2018, Shinsho and HyQuality entered into a Consignment Agreement. Under this agreement, HyQuality would order steel, and the steel would be delivered to the Warehouse, "but title to that steel would remain with Shinsho until such time as it was sold to a third party, if ever." Notably, however, the Consignment Agreement did not preclude the parties from conducting business in the same manner as they did before the Consignment Agreement was signed.

In June 2018, TransPecos assisted HyQuality in obtaining a credit facility with another lender: Crestmark. Assisting HyQuality was in TransPecos's "best interest . . . because it freed up some cash flow so that [HyQuality] could then go out and buy more inventory, which would, when the inventory was sold, help the overall business." In order to facilitate the agreement between HyQuality and Crestmark, TransPecos agreed to subordinate its security interest in collateral to Crestmark Bank.

By late 2019, Shinsho had become concerned about the delinquent status of HyQuality's payments on invoices issued prior to the signing of the Consignment Agreement, as well as HyQuality's purported failure to follow terms of the Consignment Agreement with respect to consigned inventory. Shinsho attempted to address its concerns by visiting the Warehouse and "making arrangements for the removal of" allegedly consigned inventory, but HyQuality denied Shinsho access to the property. As a result, Shinsho sued HyQuality on February 18, 2020.[2]

---

[2] Shinsho originally brought suit in Texas state court, but HyQuality removed to federal court on February 19, 2020.

No. 23-20520

Shinsho's lawsuit concerned two different categories of steel: (1) steel shipped to HyQuality by Shinsho, for which Shinsho invoiced HyQuality, but for which HyQuality did not provide payment; and (2) steel that Shinsho shipped to HyQuality, for which Shinsho did not invoice HyQuality, and which was present at the Warehouse when Shinsho's lawsuit was filed. This second category of steel became known as the "Subject Bar." Shinsho alleged that HyQuality was not the owner or title holder of the Subject Bar because it was shipped pursuant to the Consignment Agreement, and that HyQuality was improperly denying Shinsho access to the Warehouse, impeding Shinsho's ability to audit and remove the Subject Bar. Shinsho also alleged that HyQuality was wrongfully removing the Subject Bar from the Warehouse.

On March 3, 2020, the district court entered an Agreed Order Granting Preliminary Injunction. As relevant here, the Preliminary Injunction prevented HyQuality from selling the Subject Bar, except for under an established procedure set forth in the Preliminary Injunction itself. From March 3, 2020, through the date of trial, HyQuality sold a substantial volume of the Subject Bar pursuant to these procedures.

On March 26, 2020, HyQuality informed TransPecos of the Preliminary Injunction. Approximately one year later, on February 5, 2021, TransPecos moved to intervene, and the district court granted TransPecos's motion on April 20, 2021. TransPecos alleged that HyQuality was an obligor to TransPecos on two promissory notes (the Smaller Loan and Larger Loan) that were secured by perfected deeds of trust and security agreements. TransPecos claimed that the collateral securing the repayment of the notes consisted of HyQuality's assets, which included its inventory and any proceeds from the sale of that inventory. And, contrary to Shinsho's position, TransPecos alleged that HyQuality was the outright owner of the Subject Bar, which was therefore part of the collateral securing the two notes, and

that any proceeds from the sale of the Subject Bar also constituted TransPecos's collateral. Accordingly, TransPecos brought a claim against Shinsho for conversion of the proceeds Shinsho received from HyQuality's sale of the Subject Bar under the terms of the Preliminary Injunction, and it also sought a declaratory judgment that the Subject Bar is TransPecos's collateral.

On December 17, 2021, Shinsho filed a motion for partial summary judgment. On January 25, 2022, the district court granted the motion in favor of Shinsho against HyQuality in the amount of $9,385,865.61.[3] The district court conducted a bench trial on all remaining claims on February 21 and 22, 2023. On September 23, 2023, the district court entered final judgment together with its findings of fact and conclusions of law.

As to the dispute between Shinsho and HyQuality, the district court awarded Shinsho $9,975,302.83 in damages and $2,102,828.00 in prejudgment interest on those damages against HyQuality. As to the disputes between Shinsho and TransPecos, the district court first concluded that "all of the Subject Bar was ordered, shipped, and delivered [to HyQuality] under the same terms as were in place before the Consignment Agreement was executed." As a result, the district court concluded that "[HyQuality] owns all of the Subject Bar," "[t]he Subject Bar is part of [HyQuality]'s inventory," and, because TransPecos has a perfected security interest in HyQuality's inventory, the Subject Bar "is part of TransPecos's collateral."[4]

---

[3] On August 25, 2022, HyQuality's counsel moved to withdraw, a motion which the district court granted. The district court's order specified that HyQuality was required to hire new counsel, which HyQuality failed to do. Thus, upon Shinsho's motion, the district court struck HyQuality's answer and counterclaim. *See* 28 U.S.C. § 1654.

[4] These conclusions are undisputed by the parties on appeal.

No. 23-20520

However, the district court still denied TransPecos's conversion claim. Although the district court acknowledged that secured parties may generally bring actions for conversion to repossess collateral from a transferee, and that security interests generally attach to any identifiable proceeds from the sale of collateral, the district court found that TransPecos authorized HyQuality's transfer of proceeds to Shinsho free of TransPecos's security interest. In coming to this conclusion, the district court highlighted the fact that "[HyQuality] and TransPecos understood from the start that [HyQuality] would sell the Subject Bar on an ongoing basis," and that HyQuality would "us[e] the proceeds to purchase more inventory." In fact, TransPecos themselves "wanted that arrangement to avoid running afoul of SBA rules" and "agreed to [HyQuality]'s use of the proceeds on the continued operation of the business."

The district court also highlighted TransPecos's willingness to subordinate its security interest in collateral to Crestmark—including its interest in proceeds from the sale of collateral—because such an arrangement would itself benefit TransPecos by freeing up HyQuality's cash flow, thus allowing it to continue to purchase more inventory in "further[ance] [of TransPecos's] goals." Thus, the district court concluded that all these facts, taken together, supported the conclusion that "Shinsho did not wrongfully accept the proceeds [from the] sales [of collateral] in denial of TransPecos's rights."

TransPecos timely appealed.[5]

---

[5] Shinsho originally cross-appealed but subsequently dropped its cross-appeal after reviewing TransPecos's brief.

## II.

"On appeal from a bench trial, this court reviews the factual findings of the trial court for clear error and conclusions of law *de novo*." *George v. Reliance Standard Life Ins.*, 776 F.3d 349, 352 (5th Cir. 2015) (cleaned up). This court affords factual findings made during a bench trial "great deference." *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015). As such, a district court's finding of fact is clear error only if it is "implausible in the light of the record considered as a whole." *Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 233 (5th Cir. 2022) (quoting *Brumfield v. Cain*, 808 F.3d 1041, 1057 (5th Cir. 2015)).

## III.

Under Texas law, "[c]onversion occurs when, wrongfully and without authorization, one assumes and exercises control and dominion over the personal property of another, either inconsistently with or to the exclusion of the owner's rights." *United States v. Boardwalk Motor Sports, Ltd.*, 692 F.3d 378, 381 (5th Cir. 2012); *see also Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 210 n.44 (Tex. 2002). "A secured party may bring an action for conversion in order to repossess collateral from a transferee." *United States v. Boardwalk Motor Sports, Ltd.*, No. 4:08-cv-110, 2009 WL 4727911, at *2 (E.D. Tex. Dec. 3, 2009) (citing *Amarillo Nat'l Bank v. Komatsu Zenoah Am., Inc.*, 991 F.2d 273, 275 (5th Cir. 1993)). Generally, security interests in collateral "continue[] in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof," and further attach "to any identifiable proceeds of collateral." Tex. Bus. & Com. Code § 9.315(a)(1), (2).

However, if "the secured party authorize[s] the disposition [of the collateral] free of the security interest," then the secured party's security interest does not continue in the collateral. *Id.* § 9.315(a)(1). Whether a

secured party authorized the disposition of collateral free of its security interest is an issue of fact. *See Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 650–51 (5th Cir. 1991); *see also Boardwalk*, 2009 WL 4727911, at *2.

Here, the district court did not clearly err by concluding that TransPecos authorized HyQuality to transfer proceeds from the sale of TransPecos's collateral free of TransPecos's security interest. TransPecos does not contest that it fully contemplated—and, in fact, intended—that HyQuality would sell portions of its inventory (i.e., TransPecos's collateral) free and clear of TransPecos's security interest. Further, under this arrangement, HyQuality would use proceeds from those sales (i.e., also TransPecos's collateral) to conduct business, rather than necessarily pay off TransPecos's loans. As the district court noted, and as is supported by the record, an arrangement otherwise would have jeopardized TransPecos's loan to HyQuality by running afoul of SBA rules. Thus—knowing that it "w[ould] not be getting paid out of sales proceeds"—TransPecos required HyQuality to maintain a minimum inventory specifically to "build in added protection for the bank." It is reasonable to conclude that TransPecos would not have had to include this minimum-inventory provision to hedge its bets had it believed it was fully maintaining its security interest in proceeds. And, to top it all off, TransPecos was even willing to subordinate its own security interest in its collateral to a different bank, Crestmark, to help HyQuality "free[] up some cash flow" so that it could "go out and buy [and sell] more inventory."[6]

---

[6] TransPecos attempts to fault the district court's use of the Crestmark agreement as evidence that TransPecos authorized the transfer of proceeds free of its security interest. Specifically, TransPecos argues that the "subordination provided to Crestmark was only

No. 23-20520

In sum, it was not implausible for the district court to have concluded that by sanctioning both HyQuality's sale of collateral and HyQuality's use of proceeds from those sales for reasons other than paying off its loans, TransPecos was also authorizing HyQuality's disposition of those proceeds free of its security interest. TransPecos intentionally relinquished its security interest in HyQuality's inventory upon sale and intended for HyQuality to use the proceeds from those sales to support the improvement of HyQuality's business. It would appear counterintuitive to hold that TransPecos can turn around and claim a security interest in those very proceeds when the proceeds were delivered and used exactly as TransPecos intended. Thus, TransPecos's conversion claim must fail. *See* Tex. Bus. & Com. Code § 9.315(a)(1), (2); *Permian*, 934 F.2d at 649–50.

AFFIRMED.

---

as to Crestmark," and that because Shinsho "was not a third-party beneficiary," it "cannot claim any rights as a result of the subordination."

This argument misses the mark. The district court did not mention the Crestmark agreement to imply that it created some third-party right that Shinsho could enforce against TransPecos, nor did it mention the agreement to imply that the agreement applied to any other parties. Rather, the district court mentioned the agreement to highlight TransPecos's *motivation* to help HyQuality secure additional financing: furthering its own goal of HyQuality's continued purchase and sale of steel. In short, TransPecos's *willingness* to subordinate its own security interest to another bank is evidence of just how important it was to TransPecos that HyQuality be able to freely continue to buy and sell additional inventory—i.e., collateral.